1  Robert Wolfe, Esq. (State Bar No. 132845)
   ENGSTROM, LIPSCOMB & LACK
2  10100 Santa Monica Blvd., 16th Floor
   Los Angeles, CA 90067
3  Telephone (310) 552-3800
   Facsimile (310) 552-9434

4
   Alan Nakazawa, Esq. (State Bar No. 84670)
5  Dena Aghabeg, Esq. (State Bar No. 185311)
   Ken Sato, Esq. (State Bar No. 252543)
6  COGSWELL NAKAZAWA & CHANG, LLP
   444 West Ocean Boulevard, Suite 1250
7  Long Beach, California 90802-8131
   Telephone (562) 951-8668
8  Facsimile (562) 951-3933

9  Attorneys for Plaintiffs
   Alan Carpenter and Tracy Ragsdale

10

11              UNITED STATES DISTRICT COURT

12            SOUTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| ALAN CARPENTER AND TRACY RAGSDALE, individuals, | CASE NO. 07CV0166 DMS POR |
| Plaintiffs, | **MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| vs. | |
| Tug MICHAEL UHL, her engines, machinery, tackle, equipment, furnishings and appurtenances, *in rem*, and MARITIME LOGISTICS, INC., FRANK LOVING, an individual, and BLAINE HUGHES, an individual *in personam*, | Pre-trial Conference: April 3, 2009 10:00 a.m. |
| Defendants. | Trial: April 27, 2009 9:00 a.m. |
| MARITIME LOGISTICS, INC. A corporation; FRANK LOVING; BLAINE HUGHES, | Courtroom: Honorable Dana M. Sabraw |
| Counterclaimants, | |
| ALAN CARPENTER; TRACY RAGSDALE, | |
| Counterdefendants. | |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . 2

III. POINTS OF LAW SUPPORTING PLAINTIFFS'
CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A. Basis for Subject Matter Jurisdiction . . . . . . . . . . . . . . 10

    B. Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C. Plaintiffs' Claims Against Defendants . . . . . . . . . . . 12

        1. Maritime Tort Against All Defendants . . . . . . . 12

            a. Defendants Failed to Properly Prepare
               the ALBION For Towing . . . . . . . . . . . . .13

            b. Defendants Failed to Provide An
               Adequate Lookout During the
               Towage . . . . . . . . . . . . . . . . . . . . . . . . .13

            c. The Failure To Maintain A Proper
               Lookout Constituted a Statutory
               Violation and Raises the
               PENNSYLVANIA Rule . . . . . . . . . . . . .15

            d. Defendants Failed to Take Proper
               Action After The ALBION Started
               Flooding to Save The Yacht . . . . . . . . . . .16

e.   Defendants Were Negligent In Replacing Captain Loving With Captain Blaine Hughes at Morro Bay Without Adequate "Turnover" Orientation . . . . . . 17

f.   Damages . . . . . . . . . . . . . . . . . . . . . . . . .17

2.   Defendants Breached the Towage Agreement . .18

a.   The Parties Entered Into A Towage Agreement . . . . . . . . . . . . . . . . . . . . . . . .18

b.   Plaintiffs Did All Of The Significant Things That The Towage Agreement Required Them To Do, Or Were Excused From Doing Those Things . . . . .20

c.   Defendants Breached the Terms of the Towage Agreement . . . . . . . . . . . . . . .21

d.   Damages Caused by Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . .23

3.   Breach of Warranty of Workmanlike Service . . 23

4.   Plaintiffs Are Entitled to Indemnity For All Damages Caused by Defendants' Negligence . .24

5.   Plaintiffs Are Entitled to Implied Contractual Indemnity for Damages Caused by Defendants Breach of Contract . . . . . . . . . . . . 24

6.   Plaintiffs Are Entitled to Contribution . . . . . . . 24

7.   Plaintiffs Are Entitled to Declaratory Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

8. Contribution Under CERCLA . . . . . . . . . . . . . .25

9. Contribution Under OPA . . . . . . . . . . . . . . . .26

10. In Rem Claim Against the tug
  MICHAEL UHL . . . . . . . . . . . . . . . . . . . . . . 26

D. Defendants Affirmative Defenses To Plaintiffs'
 Claims Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1. Plaintiffs Exercised Due Diligence To
  Tender The ALBION In Seaworthy
  Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

2. The Casualty Was Not Caused By A Force
  Majeure As Defined In The Towage
  Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3. Plaintiffs Did Not Misrepresent the
  Condition of the ALBION Or Its Value . . . . . . 29

4. Defendants Are Not Entitled to Limit Their
  Liability to The Value of the MICHAEL
  UHL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

5. Plaintiffs' Insured Allstate Did Not Waive
  Its Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

6. Plaintiffs Did Not Fail To Mitigate
  Their Damages . . . . . . . . . . . . . . . . . . . . . . . . . .35

E. Defendants' Counterclaims Against Plaintiffs . . . . . . .35

1. Breach of Towage Agreement . . . . . . . . . . . . . .35

2. Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3. Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

4. Negligent Misrepresentation . . . . . . . . . . . . . .. 37

5. Tort of Another . . . . . . . . . . . . . . . . . . . . . . . . 37

6. Implied Indemnity . . . . . . . . . . . . . . . . . . . . . . .39

7. Contribution . . . . . . . . . . . . . . . . . . . . . . . .. .39

F. Plaintiffs' Affirmative Defensse to Defendants
Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

1. Defendants' Own Negligence Caused
Defendants' Damages . . . . . . . . . . . . . . . . . . . 39

2. Defendants' Breach of the Towage Agreements
And The Agreements Relating Thereto Caused
Their Damages . . . . . . . . . . . . . . . . . . . . . . . .. .39

3. Plaintiffs are Entitled to Limit Liability Under
The Limitation of Liability Act . . . . . . . . . . . . .. 39

4. Defendants Failed To Mitigate Their
Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

5. If the Casualty was Caused by A Force
Majeure, Which Is Denied, Plaintiffs Are
Not Liable For Defendants Alleged Damages . .43

6. Independent, Intervening or Superseding
Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 44

7. If There Was An Accord And Satisfaction
As Alleged By Defendants, Which Is
Denied, Defendants Are Not Entitled To
Recover From Plaintiffs . . . . . . . . . . . . . . . . . .44

8. CERCLA Defenses . . . . . . . . . . . . . . . . . . . . . . . 44

9. OPA Defenses . . . . . . . . . . . . . . . . . . . . . . . . .. 44

10. Miscellaneous defenses of waiver, consent, ratification, estoppel, unclean hands, Preclude recovery by Defendants . . . . . . . . . .. 45

G. Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agri-Trans v. Peavey,*
     742 F. 2d 1137,1139 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . 12

*Aqua Marine Constructors, Inc. v. Banks,*
     110 F. 3d 663, 670 (9th Cir.1997), cert denied, 522 U.S. 933,
     118 S. Ct. 339, 139 L. Ed. 2d 263 (1997) . . . . . . . . . . . . . . . 11

*Bear Creek Planning Com. v. Title Ins. & Trust Co.,*
     (1985, Cal App 3d Dist) 164 Cal App 3d 1227, 211 Cal Rptr
     172, 1985 Cal App LEXIS 1689 . . . . . . . . . . . . . . . . . . . . . . . .43

*Bisso v. Inland Waterways Corp.,*
     349 U.S. 85, 90, 75 S.Ct. 629,
     632, 99 L.Ed. 911, 917 (1955) . . . . . . . . . . . . . . . . . . . . . . . . 28

*California v. The Italian Motorship ILICE,*
     534 F. 2d 836, 839 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . .16

*Candies Towing Co. v. M/V B&C Eserman,*
     673 F.2d 91 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Canal Barge Co, Inc. v. Torco Oil Co.,*
     220 F. 3d 370, 376 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . .12

*China Union Lines, Ltd. v. A.O. Anderson & Co.,*
     364 F. 2d 769, 783 (5th Cir. 1966), cert denied, 386 U.S. 933,
     87 S. Ct. 955 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Circle Line Sightseeing Yachts, Inc. v. City of New York,*
     283 F. 2d 811, 814-815 (2d. Cir. 1960) . . . . . . . . . . . . . . . . . .14

*Coryell v. Phipps,*
      317 U.S. 406, 409; 63 S. Ct. 291, 292; 87 L. Ed. 363, 366
      (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33, 41

*Dahlmer v. Bay State Dredging & Contracting Co.,*
      26 F. 2d 603 (1st Cir. 1928) . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*David Crystal, Inc. v. Cunard S.S. Co.,*
      339 F. 2d 295, 300 (2d. Cir.1964) . . . . . . . . . . . . . . . . . . . . . .45

*Dillingham Tug v. Collier Int'l Oil Co.,*
      707 F. 2d 1086,1091 ( 9th Cir. 1983) . . . . . . . . . . . . . . . . . . . .23

*Exxon Co., U.S.A. v. SOFEC, Inc.,*
      517 U.S. 830, 839, 116 S. Ct. 1813 (1996) . . . . . . . . . . . . . . .12

*Fairmont Shipping Corp. v. Chevron Int'l Oil Co.,*
      511 F. 2d 1252, 1260 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . 23

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*
      513 U.S. 527, 534, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024
      (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*JOHN G. STEVENS,*
      170 U.S. 113, 125, 42 L. Ed. 969, 18 S. Ct. 544 (1898) . . . . .27

*Hanover Insurance v. Puerto Rico Lighterage,*
      553 F. 2d 728, 730 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . . .25

*Henry Dubois v. Steamtug MERCER,*
      47 F.2d 172, 174 (2d. Cir. 1931) . . . . . . . . . . . . . . . . . . .12, 16

*in re Complaint of Interstate Towing Co.,*
      717 F. 2d 752, 755 (2d. Cir. 1983) . . . . . . . . . . . . . . . . . . . . .14

*J.A.R., Inc. v. M/V Lady Lucille,*
      963 F. 2d 96, 98 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 11

*King v. Deutsche Bank,*
    2005 U.S. Dist. LEXIS 11317 (D. Or. 2005) . . . . . . . . . . . . .25

*Noor Begum Karim v. Finch Shipping Company, Ltd.,*
    265 F.3d 258, 263 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . .32, 40

*Norfolk S. Ry. Co. v. Kirby,*
    543 U.S. 14, 25, 125 S. Ct. 385, 160
    L.Ed. 2d 283 (2004) Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Norwich & N.Y. Tranp. Co. v. Wright,*
    118 U.S. 468 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

*Oriente Commercial v. M/V FLORIDIAN,*
    529 F.2d 221, 222 ( 4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . 26

*Pennzoil v. Offshore Express,*
    1994 A.M.C. 1034, 1046 (5th Cir. 1991) . . . . . . . . . . . . . 34, 42

*Sana v. Hawaiian Cruises, Ltd.,*
    181 F.3d 1041, 1047 (9th Cir. 1999) . . . . . . . . . . . . . . . . . 32, 41

*Saratoga Fishing Co. v. J.M. Martinac & Co.,*
    520 U.S. 875, 879, 117 S. Ct. 1783, 1786 (1997) . . . . . . . . . 11

*Signal Oil & Gas Company v. The Barge W-701,*
    468 F. Supp. 802, 813 (E.D. La. 1979); aff'd 654 F. 2d 1164
    (5th Cir. 1981), cert. denied, 455 U.S. 944, 102 S. Ct. 1440, 71
    L. Ed. 2d 656 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 41

*Simkins v. Morrison,*
    107 F. 2d 121, 122 (5th Cir. 1939) . . . . . . . . . . . . . . . . . . . . . .12

*Sirius Ins. Co. (UK)  v. Collins,*
    16 F. 3d 34, 36 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . .10

*South, Inc. v. Moran Towing & Transp. Co., Inc.,*
      1966 AMC 1987, 1990, 360 F.2d 1002, 1005 (2 Cir. 1966) . .31

*Stevens v. The WHITE CITY,*
      285 U.S. 195, at 202, 52 S. Ct. 347, 350 (1932) . . . . . . . . . . .12

*Sutton v. Earles,*
      26 F.3d 903, 912 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 11

*The PENNSYLVANIA v. Troop,*
      86 U.S. (19 Wall.) 125 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Trinidad Corp. v. S.S. KEIYO MARU,*
      845 F. 2d 818, 824-25 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . 16

*Tug OCEAN PRINCE v. United States,*
      584 F.2d 1151, 1159 1160 (2d Cir. 1978) . . . . . . . . . . . . 13, 15

*United States v. Reliable Transfer Co.,*
      421 U.S. 397, 411, 95 S.Ct. 1708, 1715-1716 (1975) . . . . . . .25

*Unocal Corp. v. United States,*
      222 F.3d 528, 543 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . 44

*SeaRiver Maritime, Inc. v. s Industrial Medical Services, Inc.,*
      983 F. Supp. 1287, 1298 (N.D. Cal 1997) . . . . . . . . . . . . . . .24

*Adler v. Royal Cruise Line, Ltd.,*
      1996 A.M.C. 1349 (N.D. Cal. 1996) . . . . . . . . . . . . . . . 30, 31

*Alaska Packers v. O/S EAST POINT,*
      421 F.Supp. 48, 52 (W.D. Wa. 1976) . . . . . . . . . . . . . . . . . .14

*Burger v.Kuimelis,*
      325 F. Supp. 2d 1026, 1042 (N.D. Cal. 2004) . . . . . . . . . . . .38

*Grace Line, Inc. v. U.S. Lines Co.,*
     193 F. Supp. 664, 672 (SDNY 1961),
     aff'd 302 F. 2d 933 (2d Cir. 1962) . . . . . . . . . . . . . . . . . . . . . 14

*Hermann C. Starck, Inc. v. Finn Lines (Oy Finnlines Ltd.),*
     1978 A.M.C. 1330, 1340 (S.D.N.Y. 1978) . . . . . . . . . . . . . . 45

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*
     170 U.S. 113, 125, 42 L. Ed. 969, 18 S. Ct. 544 (1898) . . . . 11

*In re Complaint of Interstate Towing Co.,*
     717 F. 2d 752, 755 (2d. Cir. 1983) . . . . . . . . . . . . . . . . . . . .30

*Loginter v. M/V NOBILITY,*
     2001 A.M.C. 283, 288 (D. Md. 2001) . . . . . . . . . . . . . . . . . 11

*Marshall v. Wellcarft Marine, Inc.,*
     103 F. Supp. 2d 1099, 1114 n. 10 (S.D. Ind. 1999) . . . . . . .30

*Moran Scow v. S.S. Boston,*
     342 F. Supp. 216, 239 (S.D.N.Y. 1972) . . . . . . . . . . . . . . . .13

*Prince v. Thomas,*
     25 F. Supp. 2d 1045 at 1047 (N.D. Cal. 1997) . . . . . . 11, 12, 25

*Shebby Dredging Co., Smith Bros., Inc.,*
     469 F. Supp. 1279, 1285 (D. Md. 1979) . . . . . . . . . . . . . . . .28

*Yang Ming Marine Transport Corp. v. Oceanbridge*
*Shipping Intern., Inc.,*
     48 F. Supp. 2d 1049, 1064 (C.D. Cal. 1999) . . . . . . . . . . . . .24

## STATE CASES

*Bay Development, Ltd. v. Superior Court,*
 (1990) 50 Cal. 3d 1012, 269 Cal Rptr 720, 791 P2d 290, 1990
 Cal LEXIS 2116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

*Cicone v. Urs Corp.,*
 (1986) 183 Cal. App. 3d 194, 200 . . . . . . . . . . . . . . . . . . . . . .29

*City of Ukiah v. Fones,*
 (1966) 64 Cal.2d 104, 107-108, 48
 Cal.Rptr. 865, 410 P.2d 369 . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Consumer Advocates v. Eschostar Satellite Corp.,*
 (2003) 113 Cal. App. 4th 1351 . . . . . . . . . . . . . . . . . . . . . . . . 30

*Coykendall v. Jackson,*
 (1936) 17 Cal. App. 2d 729, 731 . . . . . . . . . . . . . . . . . . . . . . . 22

*Diediker v. Peelee Financial Corp.,*
 (1997) 60 Cal. App. 4th 288, 298 . . . . . . . . . . . . . . . . . . . . . . .30

*Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins. Assoc.*
 (2004) 115 Cal. App. 4th 1145, 1154

*John Hancock Mutual Life v. Setser,*
 (1996) 42 Cal. App. 4th 1524, 1531-1535 . . . . . . . . . . . . . . .38

*Knipe v. Barkdull,*
 222 Cal. App. 2d 547, 551, 35 Cal. Rptr. 283, 285 (1963) . . .22

*Neu Visions Sports, Inc. v. Soren/McAdams/Bartells,*
 (2000) 86 Cal. App. 4th 303, at 308, 310 . . . . . . . . . . . . . . . 30

*Prentice v. North America Title,*
 59 Cal. 2d 618, 620; 381 P.2d 645, 647;
 30 Cal. Rptr. 821, 823 (1963) . . . . . . . . . . . . . . . . . . . . . . . . .38

*Reliance Electric Co. v. Superior Court,*
   (1986) 190 Cal App. 3d 369, 375 . . . . . . . . . . . . . . . . . . .39

*Roesch v. De Moto,*
   (1944) 24 Cal.2d 563, 572, 150 P.2d 422 . . . . . . . . . . . . . . 35

*Steen v. Southern California Supply Co.,*
   (1925) 74 Cal. App. 265, 267 . . . . . . . . . . . . . . . . . . . . . . . 30

*Steward v. Cox,*
   (1961) 55 Cal. 2d 857, 863; 362 P.2d 345;
   13 Cal. Rptr. 521, 524. . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

## **FEDERAL STATUTES**

28 U.S.C. § 1331(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. §2201(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

33 U.S.C. § 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

33 U.S.C. §2702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 44

33 U.S.C. §2709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

42 U.S.C. §§ 9601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25,44

46 U.S.C. § 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 40

46 U.S.C. § 30501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40

46 U.S.C. § 30505(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . .31, 40

## FEDERAL RULES

Supplemental Admiralty Rule C,
Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . .27

## CA STATE STATUTES

Code Civ. Proc., § 1021.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 45

## OTHER AUTHORITIES

*1 Witkin, Summary of Cal. Law*
(9th Cir. 1987) Contracts, §925 . . . . . . . . . . . . . . . . . . . . . . . 22

1972 Collision Rules, Rule 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*2 Thomas J. Schoenbaum Admiralty and Maritime Law*,
Section 14-3 (2d. ed. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Benedict on Admiralty*,
Vol. 3, Section 41, page 5-4 (7th Ed.) . . . . . . . . . . . . . . . . .33, 42

CACI 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CACI 1900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CACI 1903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CACI 3800 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

CACI 3801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Parks & Catell, The Law of Tug, Tow and Pilotage*
(3d ed.), p. 23, 148, 149, 186, 345,
346, 364 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 16, 33, 41, 42

Restatement Second of Torts, § 440 . . . . . . . . . . . . . . . . . . . . . . . 44

# MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I.

## INTRODUCTION

The instant litigation concerns the sinking of the yacht ALBION, while under tow by Frank Loving and Maritime Logistics. The ALBION sank on January 31, 2005 off the coast of Monterey, California.

Plaintiffs Alan Carpenter and Tracy Ragsdale (hereinafter "Plaintiffs"), husband and wife, were the owners of the ALBION. Defendants Maritime Logistics, Inc. and Frank Loving, were the owners/operators of the tug MICHAEL UHL which was towing the unmanned ALBION when it sank. Defendant Blaine Hughes was the substitute captain on board the MICHAEL UHL at the time of the casualty. Defendants Maritime Logistics, Frank Loving, Blaine Hughes and the tug MICHAEL UHL are hereinafter referred to as the "Defendants."

Plaintiffs brought this admiralty action against Defendants *in personam* and *in rem* seeking to recover for the loss of the ALBION, costs and expenses incurred in attempting to salvage the ALBION, for the settlement paid to the United States for removal, abatement and environmental damage, and attorneys' fees and costs incurred in relation to the casualty. Defendants filed a counterclaim against Plaintiffs seeking to recover their damages, expenses, their settlement paid to settle the claims of the United States, and attorneys' fees and costs.

## II.

## STATEMENT OF MATERIAL FACTS

In May, 2000, Plaintiffs Alan Carpenter and Tracy Ragsdale (hereinafter "Plaintiffs"), husband and wife, purchased the ALBION from Nielsen Beaumont, a boat repair facility located in Shelter Island, San Diego. The ALBION, formerly known as the VIKING, was a sixty-two foot sea trawler. The VIKING was

1  recovered in Mexico after an apparent attempt to scuttle the VIKING by the prior
2  owners. Over the next five years, the Plaintiffs, spent countless hours, and almost
3  $200,000.00 refurbishing the ALBION. From May 2000 to January 2005, the
4  ALBION had been inspected on several occasions, both in and out of the water,
5  and from bow to stern by several Nielsen Beaumont employees, including a very
6  accomplished shipwright, Phil Dupree. In addition to normal maintenance of the
7  ALBION, Nielsen Beaumont and the Plaintiffs replaced the yacht's two diesel
8  engines, performed a complete overhaul of the drive shafts and their linkage,
9  inspected hundreds of the hull's fasteners, reinforced the ribs of the yacht, repaired
10 all of the thru hulls, replaced all packs, including rudder packs, and repaired a
11 couple of planks on the ALBION that had suffered from minor electrolysis. Since
12 the affected planking was below the waterline, and the ALBION is made of bead
13 and cove planking and then fastened vertically and horizontally, the repair was
14 performed by Phil Dupree.[1] The remainder of the planking was sound. Phil
15 Dupree, after the repairs were completed, considered the ALBION to be a
16 substantial, strongly-built wooden boat.

17       In November 2004, the Plaintiffs sought out to find a method in which to
18 tow the ALBION from San Diego to Oregon.[2]  The Plaintiffs were referred to

19

20       [1]Each plank made of mahogany approximately three inches tall by two inches
   wide and sixteen feet long were bead and cove and then fastened from the top of the
21 plank through the entire plank into the plank immediately below it; each plank was
22 then fastened to the ribs of the boat. This type of construction, because of the bead
   and cove configuration, along with the fastening made it virtually impossible to
23 spring a plank as the defendants suggests because it would require a complete
24 structural failure of the boat.

25       [2]The ALBION was fully operational and could have made the voyage under her
26 own power, however, Alan Carpenter, because of his physical disabilities, did not feel
   comfortable in piloting the ALBION for such a long distance by himself. The
27 Plaintiffs considered hiring a crew to motor the ALBION to Oregon, but after meeting
28 with Frank Loving felt comfortable that he could safely perform the tow.

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   Frank Loving, who told Alan Carpenter that he was an accomplished tower – a

2   "master of towing"– and that he had towed vessels as far as Chile. Alan Carpenter

3   told Frank Loving and his first mate Steve Ruttschow about his love for the

4   ALBION, and that the ALBION had apparently been scuttled by the prior owners

5   and the yacht was recovered partially flooded. Over the next several weeks,

6   Loving inspected the ALBION at least on five to six occasions and made

7   recommendations to the Plaintiffs to ready the ALBION for tow. Frank Loving

8   told the Plaintiffs to board the windows, secure all equipment, seal thru hulls and

9   seal the lights. Since Frank Loving's tug, the MICHAEL UHL[3], was in dry dock

10   for an inspection and not immediately available to depart, the Plaintiffs took the

11   next several weeks to accomplish the requests of Frank Loving to ready the

12   ALBION for tow. In addition to those items specifically requested by Frank

13   Loving, Alan Carpenter installed a portable generator and portable trash pump in

14   addition to the ALBION's permanent bilge pumps which were all connected by

15   Carpenter to one activation switch in the case of an emergency. Further, Alan

16   Carpenter and Frank Loving discussed that the drive shafts must be locked or

17   "dogged" for the tow. Alan Carpenter told Frank Loving that he was going to use

18   "u-bolts" and a fitment to lock the shafts to the engine beds. Frank Loving told

19   Carpenter that he did not want to use the method suggested by Carpenter to lock

20   the shafts, but that he would use chain locks instead so he could motor the

21   ALBION in and out of harbors if needed. Loving then told Carpenter that his

22   crew would lock the drive shafts. Apparently, steel bars, instead of chain locks,

23   were fabricated by Frank Loving and his crew to act as locks for the shafts. The

24   steel bars were not designed as Alan Carpenter had requested and were not

25

26

27

28         [3] Frank Loving valued the MICHAEL UHL at $450,000.00.

designed to be attached to the engine beds.[4] Once the Plaintiffs did the preparations as requested by Frank Loving, Frank Loving believed that the ALBION was suitable for tow and that it was clean, dry, and secure. The ALBION was seaworthy

On January 20, 2005, the ALBION was brought alongside of Pearsons Fuel Dock in San Diego by the crew of the MICHAEL UHL and filled with 1416.8 gallons of diesel fuel. Thereafter, Steve Ruttschow and Alan Carpenter took the ALBION for a sea trial. According to Steve Ruttschow and Alan Carpenter, the ALBION was brought up to near full speed and Steve Ruttschow performed hard overhelm steering maneuvers at sea. Both Carpenter and Ruttschow recall that the ALBION performed very well. After about an hour of the sea trial, Steve Ruttschow returned the ALBION to her berth at Nielsen Beaumont.

On January 21, 2005 at around 2:00 p.m., the Plaintiffs and Frank Loving entered into a towage agreement whereby the Plaintiffs agreed to pay Frank Loving $36,000.00 to tow the ALBION from San Diego to Winchester Harbor, Oregon. The Plaintiffs gave Frank Loving a check for $18,000.00 with the remainder to be paid upon delivery to Oregon. The Plaintiffs told Frank Loving that they did not care how long it took to get the ALBION to Oregon, as long as it arrived safely. That evening, in preparation for the tow, around 10:30 p.m., Steven Ruttschow motored the ALBION under its own power around Shelter Island, about two miles from its berth at Nielsen Beaumont to Pearson's fuel dock to get the ALBION ready for tow. Battery operated navigation lights were put on the ALBION by Maritime Logistics so the ALBION's power would not be used. However, Steve Ruttschow can not recall whether he locked the drive shafts after

---

[4]Evidence exists of an attempt to lock the shafts using a small steel bar. However, the starboard engine has a only one end of the steel bar attached, and on the port side engine, the bar is completely missing, but a loose bolt, where the bar was to be fastened, is still in the engine casing.

he motored the ALBION alongside the MICHAEL UHL, nor does any other crew member recall doing so. An hour later, Frank Loving (Captain), Steve Ruttschow (mate), Lance Leage and Barry Lambert, (deck hands) set out for the tow to Oregon.

The ALBION made the first leg of the tow to Morro Bay without incident and arrived in Morro Bay on January 23, 2005 at 5:35 p.m. The weather on the first leg to Morro Bay was clear and the seas were calm. As Frank Loving described, "there was not even enough weather to put spray on the boat." Frank Loving's practice during the tow, with the exception of momentary diversions to check the navigation, had constant eyes on the ALBION. The tow from San Diego to Morro Bay went without incident. In fact, Frank Loving described the tow as the "perfect tow." Upon arrival into Morro Bay, Frank Loving reported that the ALBION had no water in her bilge, the hull was in good shape, everything was running, the lights turned on, and the hull was sound.

The ALBION sat in Morro Bay for a week waiting for a good weather window. Frank Loving periodically inspected the ALBION in Morro Bay and found it to be in great shape with no water. At no time did Frank Loving nor anyone from Maritime Logistics ask the Plaintiffs to travel to Morro Bay to inspect the ALBION for the second leg of the trip to Oregon nor did the Plaintiffs do so.

On January 30, 2005 at 7:00 a.m., the MICHAEL UHL and the ALBION departed from Morro Bay. At 8:00 a.m., the MICHAEL UHL and the ALBION exited Morro Bay, lengthened the towline and were underway for Oregon. However, this time, Frank Loving was not the Captain. A new Captain, Blaine Hughes, was substituted in place for Frank Loving without the Plaintiffs' knowledge or consent. This time, the crew consisted of Blaine Hughes (Captain),

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Steve Ruttschow (mate), Lance Leage and Barry Lambert (deck hands). [5] Once again, the weather was clear and the seas were calm. According to Blaine Hughes, the weather conditions were "ideal". By 8:00 p.m., the ALBION was down by the bow.

The crew of Maritime Logistics did not take any precautions to assist it in the event the ALBION started to take on water. Maritime Logistics did not place a boot stripe on the ALBION at the water line to assist it in determining whether the ALBION was taking on water; it did not place a high water bilge alarm or strobe light on the ALBION to warn in the event of the ALBION taking on water; it did not even have a dinghy onboard to approach the ALBION case there was an emergency. Maritime Logistics failed to continuously watch the ALBION to determine if it was taking on water. At best, during the second leg of the tow, in violation of Frank Loving's practice, Blaine Hughes checked the ALBION once an hour, and according to his log, the crew of the MICHAEL UHL did not check on the ALBION for at least two hours before it noticed the ALION was down by the bow. At the time of the casualty, two of the crew members, Steve Ruttschow and Lance Leage, were asleep. Further, during his shift, Blaine Hughes would lay down leaving only the deck hand Barry Lambert to navigate the MICHAEL UHL and be a lookout. By the time Blaine Hughes and Barry Lambert noticed the stricken ALBION, it was too late to dewater the ALBION. The ALBION's decks were completely awash. Blaine Hughes, instead of waiting for help to arrive to salvage the ALBION, elected to tow the ALBION underwater for eleven and one-half hours. In fact, at the time Blaine Hughes contacted the United States Coast Guard, he reported that he had already changed course and was underway to

---

[5]The Plaintiffs were never told of the substituted Captain or even the possibility that a substitute Captain could or would be used in place of Frank Loving. In fact, according to Blaine Hughes, he was not even contacted by Frank Loving about the second leg of the trip until after Loving and the tow set out from San Diego.

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1 Monterey, that he did not need assistance at all, and there was no diesel fuel on
2 board the ALBION. The crew of the MICHAEL UHL did not see or report any
3 containers, logs, deadheads, or debris in the water that would be a hazard to
4 navigation from the time it left Morro Bay.

5 At approximately 8:30 a.m. and now well insight of Monterey Harbor, three
6 large swells struck the ALBION from directly astern. The third swell swamped
7 the ALBION completely where she sank. The MICHAEL UHL then continued to
8 tow the ALBION, completely submerged for another hour and one-half into the
9 Monterrey Bay National Marine Sanctuary until the National Marine Sanctuary
10 Police ordered the MICHAEL UHL to stop at 10:15 a.m. on January 31, 2005.

11 The Plaintiffs were first notified at 11:30 p.m. on January 30, 2005 by Frank
12 Loving that the ALBION was flooded. The following morning, Alan Carpenter
13 immediately contacted a vessel assist company, Pacific Salvage, to assist in the
14 protection efforts of the ALBION. However, by the time Pacific Salvage got to
15 the ALBION, it had already sunk due to the swells.

16 At some point during the tow, the steel bar that was fit to the transmission
17 coupler on the ALBION failed to keep the port propeller shaft from rotating and
18 the bar damaged the aft end of the transmission and the transmission oil cooler
19 mounted on the aft end of the transmission. As the shaft turned with the bar
20 attached, the bar impacted on various components of the transmission and
21 surrounding vessel parts. The combination of the aft force on the propeller shaft
22 from the spinning propeller and the jarring of the shaft from the improper locking
23 bar caused the shaft coupler inside the vessel to pull free allowing the port shaft to
24 back out of the shaft packing gland. The shaft was a 2 inch diameter shaft. When
25 it backed out of the shaft packing gland this opened a 2 inch diameter hole below
26 the waterline where the shaft had been, allowing water to start flooding the vessel.
27 In addition to the port propeller shaft backing out of the packing gland there was
28 damage to the cooling water hoses for the transmission cooling water on both

engines. Flooding also likely occurred through the transmission cooling water hoses when they were torn from the engines due to the failure of the tower to secure the cooling water sea water valves prior to commencing the tow. Flooding from the shaft log flowed to the lowest part of the bilge due to the vessel not having any water tight bulkhead subdivision. It took approximately 3 to 4 hours for the ALBION to become down by the bow due to the flooding. The ALBION has a large deep volume in the forward part of the vessel and flooding would cause the bow down condition observed by the MICHAEL UHL's crew.

Despite Plaintiffs providing Frank Loving and Maritime Logistics with a seaworthy yacht reasonably fit for the tow, by inspecting, repairing and refurbishing the ALBION, Maritime Logistics' failures caused the ALBION to sink. Maritime Logistics failed to properly prepare the ALBION for tow as promised by Frank Loving. Maritime Logistics' failure to install proper shaft locks on the ALBION as agreed prior to the tow and failure to secure the sea valves for the engine cooling water intakes after operating the vessel resulted in the flooding of ALBION. Maritime Logistics failed to properly inspect the ALBION in Morro Bay once the Captain was substituted. Maritime Logistics failed to install a proper flooding alarm or to mark the ALBION so that flooding could be detected early, which also contributed to the sinking of the ALBION. Maritime Logistics failed to properly equip its vessel in the case of an emergency, and clearly did not keep a proper lookout for distress to the ALBION and navigational hazards in the seas. Finally, their failure to bring salvage assets to the flooding vessel or to immediately inform the owner of the flooding situation prevented salvage of the vessel which most likely would have saved ALBION and prevented the need for costly removal from the Monterey Bay Marine Sanctuary.

Unfortunately, the Plaintiffs could not raise the ALBION immediately after she went down. The Plaintiffs paid Pacific Salvage $190,000.00 for its services in trying to raise the ALBION. Thereafter, in 2007, the United States of America

brought suit against Maritime Logistics and the Plaintiffs for removal costs, pollution abatement and environment damage. The Plaintiffs paid $392,936.00 in settlement of the United States claim. In addition, the Plaintiffs have lost the value of the ALBION. The value of the ALBION at the time of the loss was $170,000.00. Lastly, the Plaintiffs have incurred and will incur at least $275,000.00 in legal fees and costs in relation to sinking of the ALBION.

## III.

## POINTS OF LAW SUPPORTING PLAINTIFFS' CLAIMS

### A. Basis for Subject Matter Jurisdiction

This action was brought under the admiralty jurisdiction of the Court, 28 U.S.C. Section 1331(1), and Federal Rule of Civil Procedure Rule 9(h). The parties agree that admiralty jurisdiction exists.

### B. Applicable Law

This matter involves claims for maritime tort within the admiralty jurisdiction of the Court since it relates to maritime activity and commerce and the alleged torts occurred on navigable waters. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024 (1995). The maritime torts are therefore governed by federal maritime law.

Further, the Towage Agreement at issue in this case is a maritime contract governed by federal maritime law because the nature and character of the contract is maritime commerce and the transportation by sea. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25, 125 S. Ct. 385, 160 L.Ed. 2d 283 (2004) Ltd.; *Sirius Ins. Co.*

1  *(UK)  v. Collins*, 16 F. 3d 34, 36 (2nd Cir. 1994); *J.A.R., Inc. v. M/V Lady Lucille*,
2  963 F. 2d 96, 98 (5th Cir. 1992);  *Aqua Marine Constructors, Inc. v. Banks*, 110 F.
3  3d 663, 670 (9th Cir.1997), *cert denied*, 522 U.S. 933, 118 S. Ct. 339, 139 L. Ed.
4  2d 263 (1997).
5       Where admiralty and maritime jurisdiction exists, maritime law applies.
6  "[F]ederal courts have authority to develop a substantive body of general maritime
7  law applicable to cases with the admiralty and maritime jurisdiction." *Sutton v.*
8  *Earles,* 26 F.3d 903, 912 (9th Cir. 1994) (quoting Thomas J. Schoenbaum,
9  ADMIRALTY AND MARITIME LAW, §4-1).  "The general maritime law
10  affords redress for injuries and damage caused by negligence." Id.; *Prince v.*
11  *Thomas,* 25 F. Supp. 2d 1045, 1047 (N.D. Cal. 1997).
12       "The general maritime law, however, is not a complete or all-inclusive
13  system..." *Sutton v. Earles*, 26 F. 3d 903, 912 (9th Cir. 1994).  Courts sitting in
14  admiralty may draw guidance from the extensive body of state law, treatises, and
15  other scholarly sources when new situations arise. *Exxon Co., U.S.A. v. SOFEC,*
16  *Inc.*, 517 U.S. 830, 839, 116 S. Ct. 1813 (1996); *see also Saratoga Fishing Co. v.*
17  *J.M. Martinac & Co.,* 520 U.S. 875, 879, 117 S. Ct. 1783, 1786 (1997)(citing
18  Restatement (Second) of Torts).
19       The parties also agreed in the Governing Law clause of the Towage
20  Agreement that the "agreement shall be governed by the general maritime law of
21  the United States, or by the laws of the State of California in the event there is no
22  applicable general maritime rule of law.  A choice of law provision in a maritime
23  contract is enforceable. *Loginter v. M/V NOBILITY*, 2001 A.M.C. 283, 288 (D.
24  Md. 2001).
25  ///
26  ///
27  ///
28  ///

## C. Plaintiffs' Claims Against Defendants

### 1. Maritime Tort Against All Defendants

Under general maritime law, a tug has a duty to exercise reasonable and ordinary care and skill in a towage. This duty includes the duty to exercise reasonable care in the navigation and in handling and caring for the tow. The tug must exercise reasonable care and maritime skill as prudent navigators employ of the performance of similar services. *Stevens v. The WHITE CITY*, 285 U.S. 195, at 202, 52 S. Ct. 347, 350 (1932).

A tug in a towage situation also has the duty to take proper action after a casualty and take whatever action is necessary to mitigate damages. *Henry Dubois v. Steamtug MERCER*, 47 F.2d 172, 174 (2nd Cir. 1931); *Also see* Parks & Cattell, The Law of Tug, Tow and Pilotage (3d ed.), p. 186, *et seq*. with cases ("The tug has the duty, after a disaster has occurred, to stand by and take such reasonable precautions as the circumstances may require. What constitutes 'reasonable precautions' depends wholly on the circumstances.").

The owner of the tow bears the burden at trial of proving the tug's duty to the tow, the tug's breach of such duty, and the damages that the tug's breach proximately caused. *Stevens* v. The *WHITE CITY*, 285 U.S. 195, at 202, 52 S. Ct. 347, 350 (1932). *Also see Canal Barge Co, Inc. v. Torco Oil Co.*, 220 F. 3d 370, 376 (5th Cir. 2000)("To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'"); *Prince v. Thomas,* 25 F. Supp. 2d 1045, at 1047 (N.D. Cal. 1997).

Where the circumstances of the loss warrant, courts have presumed negligence and shifted the burden to the tug to show a reasonable excuse of the accident other than its own negligence. *See Agri-Trans v. Peavey*, 742 F. 2d 1137,1139 (8th Cir. 1984); *Simkins v. Morrison*, 107 F. 2d 121, 122 (5th Cir. 1939);

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1

### a. Defendants Failed to Properly Prepare the ALBION For Towing

In this case, the Defendants failed to exercise reasonable care in caring for the ALBION and preparing the ALBION for tow in that they (1) failed to adequately lock and inspect the propeller drive shafts prior to departing San Diego and Morro Bay; (2) failed to secure the sea valves for the engine cooling water intakes after operating the ALBION in San Diego; (3) failed to recommend and/or install a high water flooding alarm on the ALBION; (4) failed to recommend and/or ensure there were waterline markings on the ALBION visible while the tow was underway to observe whether the ALBION was taking on water; and (5) failed to properly equip the tug MICHAEL UHL for an emergency.

### b. Defendants Failed to Provide An Adequate Lookout During the Towage

The MICHAEL UHL was required to post a proper lookout. *See Tug OCEAN PRINCE v. United States,* 584 F.2d 1151, 1159 (2d Cir. 1978); *also see* Parks and Cattell, The Law of Tug, Tow and Pilotage (3rd ed.), p. 148, 149. The rule of maintaining a proper lookout is one of the strictest requirements in the law of admiralty. *Moran Scow v. S.S. Boston*, 342 F. Supp. 216, 239 (S.D.N.Y. 1972). It is axiomatic that:

> [t]he duty of a lookout is of the highest importance. Upon
> nothing else does the safety of those concerned so much depend.
> A moment's negligence on his part may involve the loss of the
> vessel with all the property and the lives of all on board. The
> same consequence may ensure to the vessel with which his
> shall collide. In the performance of this duty the law
> requires indefatigable care and sleepless vigilance.

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*The ARIADNE*, 80 U.S. (13 Wall.) 475, 478 (1871).

The inquiry into the sufficiency of a lookout is a question of fact to be determined from all circumstances. *See China Union Lines, Ltd. v. A.O.* Anderson *& Co.*, 364 F. 2d 769, 783 (5th Cir. 1966), *cert denied*, 386 U.S. 933, 87 S. Ct. 955 (1967).

Further, "an insufficient lookout is equivalent to none." *In re Complaint of Interstate Towing Co.*, 717 F. 2d 752, 755 (2d. Cir. 1983). A lookout must be dedicated to that duty only and must not leave his port or be inattentive, for he is "both eyes and ears of the ship," and must be properly stationed to fulfill that duty. *Dahlmer v. Bay State Dredging & Contracting Co.*, 26 F. 2d 603 (1st Cir. 1928).

The duty to keep a lookout cannot be met by a person whose other duties prevent him from devoting his undivided attention to possible hazards and dangers:

> The [Master] in control of navigation cannot fulfill...[the
> lookout] function, because his work in managing the ship
> prevents his giving undivided attention to possible obstructions
> or dangers. ...[I]t is quite possible a lookout without other duties
> could have seen the [danger] and either avoided the accident
> or at least diminished its severity.

*Circle Line Sightseeing Yachts, Inc. v. City of New York*, 283 F. 2d 811, 814-815 (2d. Cir. 1960); *See also Grace Line, Inc. v. U.S. Lines Co.*, 193 F. Supp. 664, 672 (SDNY 1961), aff'd 302 F. 2d 933 (2d Cir. 1962); *Alaska Packers v. O/S EAST POINT*, 421 F.Supp. 48, 52 (W.D. Wa. 1976).

Defendants breached their duty to exercise reasonable and ordinary care and were negligent in caring for the ALBION in that they, among other things, (1) failed to keep a vigilant and dedicated lookout of the ALBION while underway so

that they could immediately determine whether the ALBION was taking on water;
and (2) failed to keep a vigilant and dedicated lookout for deadheads, debris and
other hazards that might puncture the hull of the ALBION. The testimony of the
crew of the MICHAEL UHL will establish that they were not keeping an adequate
watch of the ALBION and there was no dedicated lookout at the time the
ALBION was taking on water since only the deckhand Barry Lambert was awake
and on watch. If the Defendants had maintained a proper lookout, they would
have discovered the ALBION in distress far sooner than they did so that
emergency assistance could be rendered. Further, Defendants failed to maintain a
proper lookout for navigation hazards such as deadheads, debris or other hazards
that might puncture the hull of the ALBION.

### c. The Failure To Maintain A Proper Lookout Constituted a Statutory Violation and Raises the PENNSYLVANIA Rule

If the tug is negligent in providing an adequate and proper lookout, then it a
violation of a statutory duty and the PENNSYLVANIA Rule applies. *Tug Ocean
Prince v. United States*, 584 F.2d 1151, 1160 (2d Cir. 1978). The 1972 Collision
Rules, Rule 5, requires all navigating vessels to maintain an alert and efficient
lookout.

33 U.S.C. Section 2005 requires:

> Every vessel shall at all times maintain a proper lookout
> by sight and hearing as well as by all available means
> appropriate in the prevailing circumstances and conditions
> so as to make a full appraisal of the situation and risk of collision.

The PENNSYLVANIA Rule, a presumption of causation, applies when a
vessel breaks a navigational statute or regulation and a casualty results. Under this

1  rule, "the burden of proof, including the burden of persuasion, is effectively

2  shifted as to the causation issue, once it is established that a vessel is guilty of

3  violating a statute or regulation." 2 Thomas J. Schoenbaum, *Admiralty and*

4  *Maritime Law*, Section 14-3 (2d. ed. 1994).   The PENNSYLVANIA rule imposes

5  the burden on the violating party to prove that the statutory violation not only did

6  not but could not have contributed to the loss or casualty.  *See* Parks & Cattell,

7  The Law of Tug, Tow and Pilotage (3rd ed.), p.23 and cases cited therein, *Candies*

8  *Towing Co. v. M/V B&C Eserman*, 673 F.2d 91 (5th Cir. 1982); *California v. The*

9  *Italian Motorship ILICE*, 534 F. 2d 836, 839 (9th Cir. 1976) citing *The*

10  *PENNSYLVANIA v. Troop*, 86 U.S. (19 Wall.) 125 (1874); *Trinidad Corp. v. S.S.*

11  *KEIYO MARU*, 845 F. 2d 818, 824-25 (9th Cir. 1988)(requiring clear and

12  convincing showing that the violation could not have been a proximate cause of

13  the collision).

14       Under the PENNSYLVANIA rule, Defendants have the burden to prove not

15  merely that their failure to maintain a proper lookout did not cause the damage or

16  loss of the ALBION, but that it could not have caused or contributed to the loss.

17

18       **d. Defendants Failed to Take Proper Action After The ALBION**

19  **Started Flooding to Save The Yacht**

20       A tug in a towage situation also has the duty to take proper action after a

21  casualty and take whatever action is necessary to mitigate damages and save a

22  sinking tow. *Henry Dubois v. Steamtug MERCER*, 47 F.2d 172, 174 (2d. Cir.

23  1931); *also see* Parks & Cattell, The Law of Tug, Tow and Pilotage (3d ed.), p.

24  186, *et seq.* with cases ("The tug has the duty, after a disaster has occurred, to

25  stand by and take such reasonable precautions as the circumstances may require.

26  What constitutes 'reasonable precautions' depends wholly on the circumstances.").

27       In this case, Defendants were negligent in failing to render proper assistance

28  to the ALBION after they discovered the yacht flooded.  The Defendants failed to

16

immediately summon the assistance of the Coast Guard or commercial salvage assets to assist in dewatering the yacht prior to it sinking. Defendants also failed to immediately inform the Plaintiffs of the flooding situation. Instead, Defendants decided to tow the partially flooded yacht over 11 hours to Monterey Bay where the yacht was swamped by three large swells and sank. Emergency assistance at the location where the Defendants discovered the distressed ALBION would have saved the yacht and prevented the need for costly removal from the Monterey Bay Marine Sanctuary.

### e. Defendants Were Negligent In Replacing Captain Loving With Captain Blaine Hughes at Morro Bay Without Adequate "Turnover" Orientation

Captain Frank Loving had first hand knowledge of the ALBION from his inspections and discussions with Plaintiffs. He was the Master of the MICHAEL UHL and was the person most familiar with the ALBION. Loving unilaterally decided, without informing Plaintiffs or obtaining their consent, to leave the MICHAEL UHL in Morro Bay, so that he could go to Mexico for vacation. This was significant because his replacement, Blaine Hughes, was not familiar with the ALBION, and indeed was not aware that there was fuel on board at the time he decided to tow the distressed ALBION to Monterey Bay. Further, Blaine Hughes, as the replacement Master did not perform an adequate inspection of the ALBION prior to departing Morro Bay.

### f. Damages

As a result of the casualty, Plaintiffs paid Pacific Salvage the amount of $190,000.00 for salvage services to raise the ALBION. Plaintiffs also paid the United States the amount of $392,936.00 to settle the United States claim for removal costs and environmental damage. Plaintiffs also have lost the ALBION

valued at $170,000.00 prior to the loss. Further, Plaintiffs have incurred and continue to incur legal fees and costs in excess of $275,000.00 in relation to the sinking of the ALBION.

## 2. Defendants Breached the Towage Agreement

To recover damages from Maritime Logistics and Frank Loving for breach of contract, Plaintiffs must prove all of the following by a preponderance of evidence:

    a. That the parties entered into a contract;

    b. That Plaintiffs performed all, or substantially all, of the significant things that the contract required them to do, or that Plaintiffs were excused from doing those things;

    c. That Defendants failed to do something that the contract required them to do; and

    d. That Plaintiffs were harmed by that failure.

Judicial Council of Cal. Civ. Jury Instr. 303 ("CACI"); *Careu & Co., v. Security Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990).

### a. The Parties Entered Into A Towage Agreement

Frank Loving and Maritime Logistics entered into a Towage Agreement dated January 21, 2005, with Plaintiffs.

Under the Towage Agreement, Loving and Maritime Logistics agreed to tow the ALBION with the tug MICHAEL UHL from San Diego to Winchester Bay, Oregon for the amount of $36,000.00

Clause 3A. provided in relevant part that "Owner warrants that it shall use due diligence to tender the Tug at the start port/place in a seaworthy condition, properly equipped, documented and with all licenses and permits routinely

required for the anticipated voyage..." "Owner has informed Customer of all special circumstances and conditions applicable to the tug which may affect performance of services hereunder."

Clause 3B. provided in relevant part that "Customer warrants it shall use due diligence to tender the Tow at the start port/place in a seaworthy condition, properly documented and with all licenses and permits required of either the Tow or cargo; the Tow shall be ready to sail on the start time/date indicated on page one, and the Tow shall be equipped with navigational lights, towing bitts, chain bridle, towing day shape, navigation equipment and emergency wire or other retrieval system; the Tow shall be capable of being towed at speeds and under the conditions normal for comparable tows;... and Customer has informed Owner of all special circumstances and conditions applicable to Tow or Cargo which may affect Owners performance of services hereunder."

Clause 9A. provides that each party shall procure insurance to cover their losses, damages, claims and liabilities, and that the parties shall look solely to such insurance rather than maintain claims against each other, *"with the exception of negligence or fault"*. [Emphasis added].

Clause 10 provides in relevant part that neither Owner nor customer are responsible for delay, failure to perform or complete performance arising from "act of God, act, neglect or default of master, mariner, pilot or servant in the navigation or management of Tug, Tow, or any towing equipment..."

Clause 12 provides in relevant part that neither party shall be responsible for indirect, consequential or special damages.

Clause 16 provides: "Neither Owner nor Customer shall have the right to subcontract performance or assign its interest in this Agreement without the express written permission of the other."

In addition, Frank Loving also undertook and agreed orally to properly secure the propeller shafts on board the ALBION and to secure the thru hulls on

1   the ALBION for tow after operating the ALBION.

2

3       **b.  Plaintiffs Did All Of The Significant Things That The Towage**

4   **Agreement Required Them To Do, Or Were Excused From Doing Those**

5   **Things**

6       Defendants were required under the Towage Agreement to exercise due

7   diligence to tender a seaworthy tow to Defendants at San Diego.  *See* Clause 3.A.

8   of the Towage Agreement.

9       The evidence will show that Defendants exercised due diligence in

10  inspecting, repairing and refurbishing the ALBION so that it was in all respects

11  seaworthy and reasonably fit for the tow and the normal conditions expected on

12  the towage.  The ALBION was staunch and watertight and as the crew described

13  the ALBION on the initial leg from San Diego to Morro Bay, was a "perfect" tow.

14  The ALBION was dry upon inspection in Morro Bay after the initial leg of the

15  towage.

16      Further, Plaintiffs were not required to lock the propeller shafts and prepare

17  the ALBION for the tow because Defendants agreed and undertook to  secure the

18  propeller shafts and make the ALBION ready for the tow.  Defendants and their

19  crew motored the ALBION to the tug MICHAEL UHL in San Diego where the

20  bridal and tow line were affixed to the ALBION by the crew.  Hence, the

21  MICHAEL UHL's crew was responsible and undertook to ensure that the

22  ALBION's propeller shafts were properly secured and that all thru hulls were

23  properly secured and closed prior to commencing the tow.  Hence, to the extent

24  the Towage Agreement required Plaintiffs to perform these tasks, which is denied,

25  Plaintiffs were excused from performing these tasks because of Frank Loving's

26  agreement and undertaking to prepare the ALBION for  tow by properly securing

27  the propeller shafts and ensure all thru hulls were secure and closed.

28      Further, Frank Loving recommended to Plaintiffs what they should do to

ready the ALBION for the tow. He recommended certain work be performed to the ALBION and this work was satisfactorily completed by Plaintiffs. As an experienced tower and "Master of Towing", Frank Loving failed to recommend and ensure that the ALBION had a bilge alarm system that would notify the tug in the event the ALBION took on water and failed to recommend and ensure that the ALBION had a visible waterline painted on its hull visible from the tug that would alert the MICHAEL UHL if the ALBION took on water and its draft changed.

### c. Defendants Breached the Terms of the Towage Agreement

Defendants Maritime Logistics and Frank Loving had the duty under the Towage Agreement to exercise reasonable care in performance of the Towage Agreement. Defendants Maritime Logistics and Frank Loving breached the Towage Agreement by failing to exercise reasonable and ordinary care in caring for the ALBION during the tow and in negligently causing the casualty. Said Defendants failed to properly prepare the ALBION for the tow after promising to do so. Defendants failed to properly inspect and secure the propeller drive shafts on board the ALBION, failed to recommend to Plaintiffs and/or install bilge alarms and water lines visible from the tug which would enable the crew of the MICHAEL UHL to monitor whether the ALBION was taking on any water, and failed to properly secure the sea valves for the engine cooling water intakes after operating the ALBION in San Diego.

Defendants also breached the Towage Agreement by negligently failing to provide a proper and adequate lookout during the voyage. *See* discussion in Section III.C.1.b. above.

Defendant Maritime Logistics and Frank Loving also breached the Towage Agreement by replacing Frank Loving at Morro Bay and substituting in a new captain, Blaine Hughes, without informing Plaintiffs and without obtaining their written permission.

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

A contract is not assignable if it (1) calls for some personal quality of the promisor, or (2) the contract expressly or impliedly limits the right to assign. 1 Witkin, Summary of Cal. Law (9th Cir. 1987) Contracts, §925; *Also see Knipe v. Barkdull*, 222 Cal. App. 2d 547, 551, 35 Cal. Rptr. 283, 285 (1963).

In this case, there was a personal relationship of confidence between Frank Loving and Plaintiffs. Plaintiffs in agreeing to hire Defendants to tow the ALBION to Oregon, relied on the character , skill, integrity and personal abilities of Frank Loving, the self-proclaimed "Master of Towing". *See Coykendall v. Jackson* (1936) 17 Cal. App. 2d 729, 731 (contract between inventor and manufacturer to advertise and sell material for engines). Frank Loving was the person most familiar with the ALBION, its condition and history. Frank Loving also made all arrangement for the tow with Alan Carpenter and as the Master of the MICHAEL UHL, was the person in charge of the tug and tow. On the other hand, Plaintiffs had never met Blaine Hughes, Mr. Hughes was not familiar with the ALBION and what it was carrying because of inadequate "turnover" orientation and Mr. Hughes failed to properly inspect the ALBION prior to departing Morro Bay.

Further, in this case, Clause 16 of the Towage Agreement also expressly or at least impliedly limited the right to subcontract performance.

Accordingly, the replacement of Frank Loving with Blaine Hughes without the written permission of Plaintiffs was a breach of the Towage Agreement and caused or at least contributed to the casualty.

Frank Loving also undertook and agreed to lock the propeller shafts on board the ALBION. He admitted agreeing to do so but neither Frank Loving or any other crew member on the MICHAEL UHL could recall securing the propeller shafts or how the shafts were secured. Frank Loving and Maritime Logistics breached their agreement by failing to properly lock the propeller shafts. This resulted in the portside propeller shaft pulling out of the coupling thereby allowing

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

water to flood the ALBION.

Defendants also breached the Towage Agreement by negligently failing to render proper assistance to the ALBION after they discovered the ALBION in distress. *See* discussion above in Section (C)(1)(d).

### d. Damages Caused by Breach of Contract

As a result of Defendants' breach of contract, Plaintiffs paid Pacific Salvage the amount of $190,000.00 for salvage services to raise the ALBION. Plaintiffs also paid the United States the amount of $392,936.00 to settle the United States claim for removal costs and environmental damage. Plaintiffs also have lost the ALBION valued at $170,000.00 prior to the loss. Further, Plaintiffs have incurred and continue to incur legal fees and costs in excess of $275,000.00 in relation to the sinking of the ALBION. Plaintiffs have sustained damages in excess of $1,027,936.00 from the sinking of the ALBION that they seek to recover from Defendants.

### 3. Breach of Warranty of Workmanlike Service

There is implied in every contract of towage a warranty to perform the services in a workmanlike manner. *Dillingham Tug v. Collier Int'l Oil Co.,* 707 F. 2d 1086,1091 ( 9th Cir. 1983); *Fairmont Shipping Corp. v. Chevron Int'l Oil* Co., 511 F. 2d 1252, 1260 (2d Cir. 1975). Like other maritime warranties, the warranty of workmanlike performance implied in a towage contract can be breached by non-negligent as well as negligent conduct. *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.,* 511 F. 2d 1252, 1260 (2d. Cir. 1975), cert. denied, 423 U.S. 838, 46 L. Ed. 2d 57, 96 S. Ct. 66 (1975).

///

///

///

**4. Plaintiffs Are Entitled to Indemnity For All Damages Caused by Defendants' Negligence**

Plaintiffs are entitled to recover from Defendants all damages caused by Defendants' negligence under their claim for equitable indemnity, on the grounds they were not at fault, and any liability that Plaintiffs incurred is the proximate result of Defendants' primary or active negligence. *See Yang Ming Marine Transport Corp. v. Oceanbridge Shipping Intern., Inc.*, 48 F. Supp. 2d 1049, 1064 (C.D. Cal. 1999); *SeaRiver Maritime, Inc. v. s Industrial Medical Services, Inc.*, 983 F. Supp. 1287, 1298 (N.D. Cal 1997); *Also see* Judicial Council of Cal. Civ. Jury Instr. ("CACI") 3800 (Equitable Indemnity)(In order for [Plaintiff] to recover, he must prove that [Defendant] was negligent and that [Defendant]'s negligence contributed as a substantial factor in causing [Plaintiff]'s harm.)


**5. Plaintiffs Are Entitled to Implied Contractual Indemnity for Damages Caused by Defendants Breach of Contract**

Plaintiffs are entitled to recover from Defendants all damages caused by Defendants' breach of the towage agreements under their claim for implied contractual indemnity on the grounds that Defendants failed to use reasonable care in performing their services under the towage agreements, and their conduct was a substantial factor in causing harm to Plaintiffs. *See* Judicial Council of Cal. Civ. Jury Instr. ("CACI") 3801 (implied contractual indemnity).


**6. Plaintiffs Are Entitled to Contribution**

Plaintiffs are entitled to recover damages from Defendants to the extent their negligence and fault was a substantial factor in causing injury to Plaintiffs or any third parties. *See* CACI 3800.

The doctrine of comparative fault applies in evaluating the negligence of parties in admiralty:

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  "[W]hen two or more parties have contributed by their
2  fault to cause property damage in a maritime collision or
3  stranding, liability for such damages is to be allocated among
4  the parties proportionately to the comparative degree of their
5  fault, and that liability for such damages is to be allocated
6  equally only when the parties are equally at fault or it is not
7  possible fairly to measure the comparative degree of their fault."

8

9  *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715-

10 1716 (1975); *Prince v. Thomas,* 25 F. Supp. 2d 1045 at 1048 (N.D. Cal. 1997).

11 The comparative fault doctrine applies to towage. *Hanover Insurance v.*

12 *Puerto Rico Lighterage,* 553 F. 2d 728, 730 (1st Cir. 1977).

13

14 **7. Plaintiffs Are Entitled to Declaratory Relief**

15 "In a case of actual controversy within its jurisdiction, ... any court of the

16 United States, upon the filing of an appropriate pleading, may declare the rights

17 and other legal relations of any interested party seeking such declaration, whether

18 or not further relief is or could be sought." 28 U.S.C. §2201(a).

19 Plaintiffs are entitled to declaratory judgment against Defendants since there

20 is a substantial controversy between parties with adverse interests regarding their

21 rights and liabilities. *See King v. Deutsche Bank,* 2005 U.S. Dist. LEXIS 11317

22 (D. Or. 2005).

23

24 **8. Contribution Under CERCLA**

25 The United States filed suit against Plaintiffs for removal costs and damages

26 under, among other statutes, the Comprehensive Environmental Response,

27 Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.

28 Plaintiffs settled the claims of the United States in said suit for the amount of

$392,936.00. CERCLA permits Plaintiffs to seek contribution from any other person who is liable or potentially liable under CERCLA.

Section 9613(f)(1) of CERCLA provides in relevant part:

> Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 USC § 9607(a)], during or following any civil action under section 106 [42 USC § 9606] or under Section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable facts as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107 [42 USC § 9606 or § 9607].

### 9. Contribution Under OPA

The United States filed suit against Plaintiffs for removal costs and environmental damage under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §2702, *et seq*. Plaintiffs settled the claims of the United States for the amount of $392,936.00. OPA permits a person to bring a civil action for contribution against any other person who is liable or potentially liable under OPA or another law. 33 U.S.C. §2709.

### 10. In Rem Claim Against the tug MICHAEL UHL

A tow has a maritime tort lien against the towing vessel for damage due to the negligence of the tug independent of any contract made for towage. *Oriente*

26

1 *Commercial v. M/V FLORIDIAN*, 529 F.2d 221, 222 ( 4th Cir. 1975) citing the

2 *JOHN G. STEVENS*, 170 U.S. 113, 125, 42 L. Ed. 969, 18 S. Ct. 544 (1898).

3      Under Supplemental Admiralty Rule C, Federal Rules of Civil Procedure,

4 "[a]n action may be brought...[t]o enforce any maritime lien;" *See* Supplemental

5 Admiralty Rule C, Federal Rules of Civil Procedure.

6      Plaintiffs brought an *in rem* action against the tug MICHAEL UHL.

7 Defendants issued a Letter of Undertaking in the amount of $410,000 to secure

8 Plaintiff's *in rem* claim to avert the arrest of the tug.

9      Plaintiffs are entitled to an *in rem* judgment against the MICHAEL UHL up

10 to and including the amount of $410,000, for any damages caused by the

11 Defendant's negligence and/or breach of contract.

12

13 **D. Defendants Affirmative Defenses To Plaintiffs' Claims Fail**

14

15      **1. Plaintiffs Exercised Due Diligence To Tender The ALBION In**

16 **Seaworthy Condition**

17      Under the Towage Agreement, Plaintiffs agreed to exercise due diligence to

18 tender the ALBION in seaworthy condition. *See* Clause 3B. of the Towage

19 Agreement. This is not an absolute warranty of seaworthiness but a warranty that

20 the tow will exercise due diligence to tender the tow in seaworthy condition.

21      In this case, Plaintiffs spent countless hours and almost $200,000.00

22 refurbishing the ALBION over a period of five years. The ALBION had been

23 inspected on several occasions both in out of the water, and from bow to stern, by

24 several Nielsen Beaumont employees, including a shipwright, Phil Dupree, and by

25 Plaintiffs themselves. The Plaintiffs also carried out the recommendations and

26 requests of Frank Loving in preparing the ALBION for tow. The ALBION was

27 staunch, strong, and seaworthy at the time it was tendered to Defendants for the

28 tow. The ALBION was a "perfect tow" from San Diego to Morro Bay and was

dry when the bilges were checked after the tow arrived in Morro Bay and prior to departure from Morro Bay.

When a tow sinks under normal sea and weather conditions and there is no evidence of negligence by the towing company, the towed vessel is presumed to have been unseaworthy. *See Shebby Dredging Co., Smith Bros., Inc.,* 469 F. Supp. 1279, 1285 (D. Md. 1979). In this case, since there is evidence that the towing company caused the sinking of the ALBION, no presumption of unseaworthiness should arise.

## 2. The Casualty Was Not Caused By A Force Majeure As Defined In The Towage Agreement

Defendants contend that the ALBION was holed by a deadhead, debris, submerged container or sharp object while be towed from Morro Bay to Oregon.

Clause 10 of the Towage Agreement provides in relevant part that neither Maritime Logistics nor the owners of the ALBION are responsible for delay, failure to perform or complete performance arising from "act of God, act, neglect or default of master, mariner, pilot or servant in the navigation or management of Tug, Tow or any towing equipment."

To the extent that this clause purports to exculpate Defendants Logistics for their own negligence, it is invalid as a matter of public policy. *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 90, 75 S.Ct. 629, 632, 99 L.Ed. 911, 917 (1955).

Defendants' force majeure defense fails because there is insufficient evidence indicating that the ALBION was holed by a deadhead, debris, submerged container or any other hazard. The evidence will show that there was no hole in the hull of the ALBION when it was inspected at the bottom of the ocean. Further, there is no evidence that the tug MICHAEL UHL struck any deadhead, debris or other hazard or that any such hazards were observed in the vicinity of the tug or tow during the voyage. Further, the evidence will show that the flooding of

the ALBION was likely caused by the failure of the Defendants to properly secure the drive shafts of the ALBION and that this allowed the shafts to rotate and cause the shaft coupler to pull free allowing the port shaft to back out of the shaft packing gland. This opened a 2 inch diameter hole below the waterline which allowed water to flood the ALBION. The evidence will also show that flooding likely occurred through the transmission cooling water hoses when they were torn from the engines due to the failure of Defendants to secure the cooling water sea water valves after operating the ALBION in San Diego just prior to commencing the tow.

### 3. Plaintiffs Did Not Misrepresent the Condition of the ALBION Or Its Value

Defendants contend that Plaintiffs misrepresented the condition and value of the ALBION when entering into the Towage Agreement. *See* Seventh and Fifteenth Affirmative Defenses in Defendants Answer to Verified First Amended Complaint and Counterclaim.

Fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e. to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Cicone v. Urs Corp.* (1986) 183 Cal. App. 3d 194, 200; *Also see* CACI 1900.

The elements of negligent misrepresentation are:

> Misrepresentation of a past or existing material fact,
> without reasonable ground for believing it to be true,
> and with intent to induce another's reliance on the fact
> misrepresented; ignorance of the truth and justifiable
> reliance on the misrepresentation by the party to whom
> it was directed; and resulting damage.

1    *Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins. Assoc.* (2004) 115 Cal.

2    App. 4th 1145, 1154 ; *Also see* CACI 1903.

3

4        Defendants base their misrepresentation claim solely upon general, non-

5    specific statements of opinion by Plaintiff Alan Carpenter regarding the condition

6    of the ALBION. Defendants contend that Mr. Carpenter described the ALBION

7    as being "unsinkable".

8        Such general, non-specific statements of opinion are not generally treated as

9    representations of fact, and thus are not grounds for a misrepresentation cause of

10   action. *See Neu-Visions Sports, Inc. v. Soren/McAdams/Bartells* (2000) 86 Cal.

11   App. 4th 303, 308. Courts have held similar superlative statements like those at

12   issue in this case as non-actionable opinion or "puffing" and not assertions of fact.

13   *See Adler v. Royal Cruise Line, Ltd. ,*1996 A.M.C. 1349 (N.D. Cal. 1996)(vessel

14   advertised as "thoroughbred, classic liner...") *Marshall v. Wellcarft Marine, Inc.,*

15   103 F. Supp. 2d 1099, 1114 n. 10 (S.D. Ind. 1999)(that yacht would give "years of

16   hassle-free bluewater cruising" was opinion concerning quality of the boat);

17   *Consumer Advocates v. Eschostar Satellite Corp.* (2003) 113 Cal. App. 4th 1351;

18   *Steen v. Southern California Supply Co.,* (1925) 74 Cal. App. 265, 267.

19       Further, representations of value are deemed to be non-actionable opinion.

20   *Neu Visions Sports, Inc. v. Soren/McAdams/Bartells,* (2000) 86 Cal. App. 4th 303,

21   at 308, 310 ("Value is quintessentially a matter of opinion, not a statement of

22   fact.").

23       Thus, any statements of opinion by Plaintiffs as to the condition and value

24   of the ALBION are not actionable.

25       Further, the tort of negligent misrepresentation requires a positive assertion

26   and an implied assertion or representation is not enough. *Diediker v. Peelee*

27   *Financial Corp.* (1997) 60 Cal. App. 4th 288, 298. To the extent that Defendants

28   claims of misrepresentation are based on implied assertions or representations,

they are not actionable.

Defendants' misrepresentation claims also fail because they cannot show justifiable reliance, an essential element of the misrepresentation cause of action. First, as a matter of law, Defendants could not have justifiably relied upon any statements of opinion made by Alan Carpenter. *See* e.g. *Adler v. Royal Cruise Line, Ltd.,* 1996 A.M.C. 1349 (N.D. Cal. 1996). Further, Frank Loving of Maritime Logistics confirmed in his deposition testimony that he did not rely on Alan Carpenter's statements as to the condition of the ALBION including his alleged statement that the ALBION was "unsinkable" and that such statements did not change the way that he towed the ALBION or otherwise performed the towage.

**4. Defendants Are Not Entitled to Limit Their Liability to The Value of the MICHAEL UHL**

Defendants Maritime Logistics and Frank Loving contend that they are entitled to limit their liability to the value of the tug MICHAEL UHL under the Limitation of Liability Act. *See* Ninth Affirmative Defense in Defendants' Answer to Verified First Amended Complaint and Counterclaim.

The United States Limitation of Liability Act, 46 U.S.C. §30501, *et seq*. permits a shipowner, under certain circumstances, to limit its liability to an amount equal to the value of its vessel plus pending freight (i.e. freight earnings for the voyage). A shipowner may be entitled to limit its liability if the cause of the casualty is not within its privity and knowledge.

Section 30505(b) of the Limitation of Liability Act provides as follows:

> (b) Claims subject to limitation. Unless otherwise excluded by
> law, claims, debts, and liabilities subject to limitation under

---

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of the owner*. (emphasis added)

Limitation under the Act may be sought by filing a petition for limitation in District Court within six months of receiving a written claim or by raising the Act as an affirmative defense in an action brought against the shipowner or the vessel. *See Noor Begum Karim v. Finch Shipping Company*, Ltd., 265 F.3d 258, 263 (5th Cir. 2001)("The Act provides shipowners two alternative legal channels to initiate their limitation of liability rights. Under Section 46 U.S.C. App. Section 183, a shipowner can 'set up [limitation] as a defense' by pleading the general substantive provisions of Section 183 in an answer filed in any court, including state court."); *Signal Oil & Gas Company v. The Barge W-701*, 468 F. Supp. 802, 813 (E.D. La. 1979); aff'd 654 F. 2d 1164 (5th Cir. 1981), cert. denied, 455 U.S. 944, 102 S. Ct. 1440, 71 L. Ed. 2d 656 (1982).("The law is now well settled that the right to limit under Section 183 may be pled as a defense in one's answer, and that a vessel owner need not file a Section 185 petition [citations omitted]"). Moreover, when pleading the limitation of liability as an affirmative defense, the six month statute of limitation for filing a petition does not apply). *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1047 (9th Cir. 1999)(The court held that the six month statute of limitations for filing a petition to limit does not apply to the assertion of limitation as a defense).

In this case, the approximate value of the MICHAEL UHL according to Frank Loving at the time of the casualty was $450,000.00. In addition, the freight for the voyage as per the Towage Agreement was $36,000.00 Accordingly, the

32

limitation, if any, for the owner of the MICHAEL UHL is $486,000.

Further, only the owner of the MICHAEL UHL is entitled to seek limitation under the Act. Hence, if Maritime Logistics, not Frank Loving, is the owner of the MICHAEL UHL, only Maritime Logistics may claim the right to limit.

Limitation is not available under Section 183 (now 46 U.S.C. §30505) of the Act, if the casualty can be attributed to the owner's privity or knowledge. *Coryell v. Phipps*, 317 U.S. 406, 409; 63 S. Ct. 291, 292; 87 L. Ed. 363, 366 (1943).

> "It has been said that 'privity' means some fault or neglect in which the owner personally participates, and 'knowledge' means personal cognizance or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss or condition likely to cause or contribute to loss, unless proper means are adopted to prevent it."

Benedict on Admiralty, Vol. 3, Section 41, page 5-4 (7th Ed.) (citations omitted).

According to Parks & Cattell, The Law of Tug, Tow and Pilotage (3d ed.), p. 345, 346:

> "The question of privity or knowledge is difficult of solution. Consequently, about all that can be said is that each case must be tested by its own factual situation. Obviously, if the tug involved is being operated by its individual owner, limitation would not be available if his or her negligence caused or contributed to the casualty. Any personal participation by an individual owner or any personal participation by a corporate executive having

1         managerial or supervisory status will defeat limitation if negligence

2         or fault on the part of such individual is found...."

3

4     The burden of proof is on the party seeking limitation to establish that it did

5 not have knowledge or privity of the negligent activity or unseaworthy condition

6 that caused the accident. *Pennzoil v. Offshore Express*, 1994 A.M.C. 1034, 1046

7 (5th Cir. 1991).

8     In this case, the casualty was caused by the negligence of Frank Loving,

9 corporate executive of Maritime Logistics and the Master of the MICHAEL UHL.

10 Loving agreed to lock the propeller drive shafts prior to the tow and to prepare the

11 ALBION for the tow after the ALBION was motored over to the MICHAEL UHL

12 by the crew of the MICHAEL UHL at the commencement of the tow. The cause

13 of the casualty was within the "fault or privity" of Loving because (1) he failed to

14 lock and inspect the propeller drive shafts at the commencement of the tow; (2)

15 failed to secure the sea valves for the engine cooling water intakes after his crew

16 operated the ALBION; (3) failed to recommend and ensure that there was a proper

17 flooding alarm and marking of the ALBION which would have alerted the tug if

18 the ALBION started taking on water; (4) failed to properly equip the MICHAEL

19 UHL in the case of an emergency; (5) failed to adequately inspect the ALBION

20 prior to departing Morro Bay; (6) improperly replaced himself with Blaine Hughes

21 at Morro Bay without a proper "turnover" orientation; (7) failed to ensure an

22 adequate and proper lookout was maintained to observe the ALBION and watch

23 the seas for navigation hazards; and (8) failed to bring salvage assets to the

24 ALBION after the ALBION was discovered taking on water which most likely

25 would have saved the ALBION. These acts of negligence were all within the

26 knowledge and privity of Frank Loving and the owner of the MICHAEL UHL is

27 therefore not entitled to limit its liability to the amount of $486,000.

28 ///

### 5. Plaintiffs' Insured Allstate Did Not Waive Its Claims

Defendants contend that Plaintiffs' insured, Allstate, waived Plaintiffs' claim in whole or in part. *See* Eleventh Affirmative Defense of Defendants Answer to First Amended Verified Complaint.

"Waiver is the intentional relinquishment of a known right after knowledge of the facts." *Roesch v. De Moto* (1944) 24 Cal.2d 563, 572, 150 P.2d 422. The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver." *City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107-108, 48 Cal.Rptr. 865, 410 P.2d 369.

### 6. Plaintiffs Did Not Fail To Mitigate Their Damages

Defendants contend that Plaintiffs failed to mitigate their damages. *See* Fourth Affirmative Defense of Defendants' Answer to Plaintiffs' First Amended Complaint.

The evidence will show that Plaintiffs acted reasonably to mitigate and minimize their damages after being notified of the casualty.

## E. Defendants' Counterclaims Against Plaintiffs

### 1. Breach of Towage Agreement

Defendants allege in their Counterclaim against Plaintiffs that Plaintiffs breached the Towage Agreement by failing to exercise due diligence to make the ALBION seaworthy and failed to inform Defendants of conditions, special circumstances and defects in the ALBION.

The evidence will show that Plaintiffs exercised due diligence to make the ALBION seaworthy prior to the commencement of the tow by properly

overhauling, repairing, refurbishing, maintaining and inspecting the ALBION.
The ALBION was tendered to the Defendants in seaworthy condition, reasonably
fit for the tow. Further, Plaintiffs informed Frank Loving and his employee,
Stephen Ruttshow, of the condition and history of the ALBION and Loving and
Ruttshow had an opportunity to inspect and sea trial the ALBION. Further, the
evidence will show that the ALBION was not tendered to Defendants for tow with
any defects.

### 2. Fraud

Defendants allege in their Counterclaim that Plaintiffs made certain
representations regarding the condition, seaworthiness and value of the ALBION
to Defendants, that these representations were false and made with the intent that
Defendants would rely on them and enter into the Towage Agreement, and that
Defendants reasonably relied on these false representations to their detriment and
undertook to tow the ALBION without knowing certain critical true facts,
conditions and special circumstances.

*See* discussion above in Section III.D.3. for elements.

### 3. Negligence

Defendants allege in their Counterclaim that Plaintiffs negligently prepared
the ALBION for the tow in various ways, including ballasting the ALBION with
diesel instead of water, negligently failing to strengthen the hull for open ocean
voyage, and negligently failed to ensure that the ALBION was seaworthy and
watertight.

The evidence will show that ballasting the ALBION with diesel was not
negligent and had no causal connection with the damages incurred by Defendants,
that Frank Loving and his crew were aware of that the ALBION had fuel in her
tanks and nevertheless never objected and accepted the ALBION for tow, and that

the crew of the MICHAEL UHL participated in the fueling of the ALBION. Further, Defendants, not Plaintiffs, caused the casualty and any pollution or damages resulting therefrom. The evidence will also show that the ALBION was properly and adequately repaired, refurbished and inspected and that it was in fact seaworthy and watertight. The casualty and the damages incurred by all parties were caused by the fault and neglect of Defendants, and Defendants only.

### 4. Negligent Misrepresentation

Defendants allege that Plaintiffs negligently made certain representations regarding the ALBION including but not limited to her condition, seaworthiness and value, that these representations were untrue and made by Plaintiffs without the exercise of due care, that Defendants reasonably relied on these representations to their detriment and undertook to tow the ALBION without knowing the true facts.

*See* discussion above in Section III.D(3).

### 5. Tort of Another

Defendants allege in their Counterclaim that the United States made a claim against Defendants for various damages including pollution abatement, removal of the wreck of the ALBION, damages to natural resources and penalties, and that said claim was settled by Defendants without prejudice to their right to seek indemnity from Plaintiffs. Defendants further allege that the claims of the United States were solely the result of the negligent acts and/or omissions of Plaintiffs. Defendants seek to recover the amount they paid in settlement of the claims of the United States plus their attorneys' fees and costs.

The common law tort of another doctrine was established in *Prentice v. North America Title*, 59 Cal. 2d 618, 620; 381 P.2d 645, 647; 30 Cal. Rptr. 821,

MEMORANDUM OF CONTENTIONS OF FACT AND LAW

823 (1963) which held: "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third party is entitled to recover compensation for the reasonably necessary loss of time, attorneys' fees and other expenditures thereby suffered or incurred."

First, Defendants have failed to explain why the California common law doctrine of the tort of another should apply to this maritime dispute governed by general maritime law.

Further, the common law doctrine of the "tort of another" has been codified in California Code of Civil Procedure §1021.6. *See Unocal v. United States*, 222 F. 3d 528, 543 (9th Cir. 2000); *John Hancock Mutual Life v. Setser*, (1996) 42 Cal. App. 4th 1524, 1531-1535.

Under Section 1021.6, a court may award attorneys' fees incurred in third party litigation if the claimant meets four requirements: (1) the indemnitee must have "prevailed on a claim for implied indemnity"; (2) a tort must have been committed by the indemnitor that involved the indemnitee in third party litigation; (3) the indemnitor must have been "notified of the demand to bring the action or provide the defense" during the third party litigation and refused to do so; and (4) the indemnitee must have prevailed entirely in the "principal case". *Burger v. Kuimelis*,325 F. Supp. 2d 1026, 1042 (N.D. Cal. 2004).

Thus, to the extent the tort of another doctrine applies at all, Defendants must prevail on their claim for implied indemnity without fault on their part and are limited to recovering the attorneys' fees incurred in the third party litigation brought by the United States.

Further, since the third party litigation brought by the United States was settled, there was no adjudication of Plaintiffs' liability in the "principal case" and no recovery is permitted under the "tort of another" doctrine in this case. *Reliance Electric Co. v. Superior Court,* (1986) 190 Cal. App.3d 369, 375.

### 6. Implied Indemnity

Defendants allege that the claims of the United States were proximately and solely caused by the negligent acts and/or omissions and/or breach of contract by Plaintiffs and were neither caused nor contributed to by any negligent acts and/or omissions and/or breach of contract by Plaintiffs. On this basis, Defendants allege they are entitled to indemnity both implied at law and in equity from Plaintiffs for the amounts Defendants paid the United States.

### 7. Contribution

Defendants allege that if they are not entitled to complete indemnification from Plaintiffs, they are entitled to contribution from Plaintiffs in the amount that represents Plaintiffs' percentage of fault as compared to the total fault of all parties which caused or contributed to the damages claimed by the United States.

## F. Plaintiffs' Affirmative Defense to Defendants Counterclaims

### 1. Defendants' Own Negligence Caused Defendants' Damages

*See* discussion in Section III.C.1. above.

### 2. Defendants' Breach of the Towage Agreements And The Agreements Relating Thereto Caused Their Damages

*See* discussion in Section III.C.2. above.

### 3. Plaintiffs are Entitled to Limit Liability Under the Limitation of Liability Act

If Plaintiffs are found liable to Defendants, Plaintiffs, as the owners of the ALBION, are entitled to limit their liability to Defendants to the value of the

ALBION after the casualty or the amount of $0, since the ALBION was a total loss.

The United States Limitation of Liability Act, 46 U.S.C. Section 30501, *et seq.* permits a shipowner, under certain circumstances, to limit its liability to an amount equal to the value of its vessel plus pending freight (i.e. freight earnings for the voyage). A party may be entitled to limit its liability if the cause of the casualty is not within its privity and knowledge.

Section 30505(b) of the Limitation of Liability Act provides as follows:

> (b) Claims subject to limitation. Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of the owner.* (emphasis added)

Limitation under the Act may be sought by filing a petition for limitation in District Court within six months of receiving a written claim or by raising the Act as an affirmative defense in an action brought against the shipowner or the vessel. *See Noor Begum Karim v. Finch Shipping Company*, Ltd., 265 F.3d 258, 263 (5th Cir. 2001)("The Act provides shipowners two alternative legal channels to initiate their limitation of liability rights. Under Section 46 U.S.C. App. Section 183, a shipowner can 'set up [limitation] as a defense' by pleading the general substantive provisions of Section 183 in an answer filed in any court, including state court."); *Signal Oil & Gas Company v. The Barge W-701*, 468 F. Supp. 802,

813 (E.D. La. 1979); aff'd 654 F. 2d 1164 (5th Cir. 1981), cert. denied, 455 U.S. 944, 102 S. Ct. 1440, 71 L. Ed. 2d 656 (1982).("The law is now well settled that the right to limit under Section 183 may be pled as a defense in one's answer, and that a vessel owner need not file a Section 185 petition [citations omitted]"). Moreover, when pleading the limitation of liability as an affirmative defense, the six month statute of limitation for filing a petition does not apply).  *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1047 (9th Cir. 1999)(The court held that the six month statute of limitations for filing a petition to limit does not apply to the assertion of limitation as a defense).

In this case, as a result of the casualty, the ALBION was a total loss  and was never recovered.   A shipowner's liability under the Act is limited to his or her "interest" in the vessel after the casualty rather than before. *See Norwich & N.Y. Tranp. Co. v. Wright,* 118 U.S. 468 (1986); *also see* Parks & Cattell, The Law of Tug, Tow and Pilotage (3rd Ed.), p. 364.  Accordingly, if Plaintiffs are entitled to limit their liability, their liability to Defendants is limited to $0.

Limitation is not available under Section 183 of the Act (now 46 U.S.C. §30505), if the casualty can be attributed to the owner's privity or knowledge. *Coryell v. Phipps*, 317 U.S. 406, 409; 63 S. Ct. 291, 292; 87 L. Ed. 363, 366 (1943).

> "It has been said that 'privity' means some fault or neglect in
> which the owner personally participates, and 'knowledge' means
> personal cognizance or means of knowledge, of which the owner
> is bound to avail himself, of a contemplated loss or condition
> likely to cause or contribute to loss, unless proper means are
> adopted to prevent it."

Benedict on Admiralty, Vol. 3, Section 41, page 5-4 (7th Ed.) (citations omitted).

According to Parks & Cattell, The Law of Tug, Tow and Pilotage (3d ed.), p. 345/346:

> "The question of privity or knowledge is difficult of solution. Consequently, about all that can be said is that each case must be tested by its own factual situation. Obviously, if the tug involved is being operated by its individual owner, limitation would not be available if his or her negligence caused or contributed to the casualty. Any personal participation by an individual owner or any personal participation by a corporate executive having managerial or supervisory status will defeat limitation if negligence or fault on the part of such individual is found...."

The burden of proof is on the party seeking limitation to establish that it did not have knowledge or privity of the negligent activity or unseaworthy condition that caused the accident. *Pennzoil v. Offshore Express*, 1994 A.M.C. 1034, 1046 (5th Cir. 1991).

In this case, the sinking of the ALBION was not caused by Plaintiffs' privity or knowledge. Plaintiffs were not at fault for the casualty. Instead, the casualty was caused solely by the negligence and/or breach of contract Defendants, including Frank Loving, corporate executive of Maritime Logistics and the Master of the MICHAEL UHL. Loving agreed to lock the drive shafts prior to the tow and to prepare the ALBION for the tow after the ALBION was motored over to the MICHAEL UHL by the crew of the MICHAEL UHL at the commencement of the tow. The cause of the casualty was caused by Defendants in that they, among other things, (1) failed to lock and inspect the propeller drive shafts at the commencement of the tow; (2) failed to secure the sea valves for the engine cooling water intakes after operating the ALBION; (3) failed to recommend and ensure that there was a proper flooding alarm and marking of the

ALBION which would have alerted the tug if the ALBION started taking on water; (4) failed to properly equip the MICHAEL UHL in the case of an emergency; (5) failed to adequately inspect the ALBION prior to departing Morro Bay; (6) improperly replaced Frank Loving with Blaine Hughes at Morro Bay without a proper "turnover" orientation; (7) failed to ensure an adequate and constant lookout was maintained to watch the ALBION and watch for navigation hazards; and (8) failed to bring salvage assets to the ALBION which most likely would have saved the ALBION.

Accordingly, if Plaintiffs are held liable in whole or in part for the casualty and the damages arising therefrom, Plaintiffs are entitled to limit their liability to $0 under the Limitation of Liability Act.

### 4. Defendants Failed To Mitigate Their Damages

*See* discussion in Section III.C.1.d. above.

### 5. If the Casualty was Caused by A Force Majeure, Which Is Denied, Plaintiffs Are Not Liable For Defendants Alleged Damages

Defendants contend, among other things, that the ALBION sank due to a force majeure, and more specifically, because it was holed by a deadhead, log, debris or other hazard. Plaintiffs contend that the sinking of the ALBION and the damages resulting therefrom were solely caused by the negligence and fault of the Defendants and/or their breaches of the towage agreements. If the Court finds that the sinking of the ALBION was caused by a force majeure for which Defendants were not liable, Plaintiffs are not liable to Defendants for their damages, attorneys' fees or costs, since they too, will be free of fault and negligence.

### 6. Independent, Intervening or Superseding Cause

Plaintiffs are also not liable to Defendants if the casualty was caused by an independent, intervening or superseding cause.

Restatement Second of Torts, section 440, provides: "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." California courts have adopted the Restatement sections on superseding causation. *Steward v. Cox* (1961) 55 Cal. 2d 857, 863; 362 P.2d 345, 348; 13 Cal. Rptr. 521, 524.

### 7. If There Was An Accord And Satisfaction As Alleged By Defendants, Which Is Denied, Defendants Are Not Entitled To Recover From Plaintiffs

To the extent there was an accord and satisfaction, which is denied, Defendants are not entitled to recover from Plaintiffs.

### 8. CERCLA Defenses

Plaintiffs are entitled to the benefit of all defenses under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., including, without limitation, any defenses under Sections 9607 and 9613.

### 9. OPA Defenses

Plaintiffs are entitled to the benefit of all defenses under the Oil Pollution Control Act of 1990 ("OPA"), 33 U.S.C. §2702, *et seq.*

///

///

///

1     **10. Miscellaneous defenses of waiver, consent, ratification, estoppel,**

2 **unclean hands, preclude recovery by Defendants**

3     Defendants are not entitled to recover from Plaintiffs to the extent recovery

4 is precluded under the doctrines of waiver, consent, ratification, estoppel, and

5 unclean hands.

6

7 **G. Attorneys' Fees**

8     If Plaintiffs are the prevailing party, they are entitled to recover their

9 reasonable attorneys' fees under Clause 17 of the Towage Agreement which

10 provides:

11         "With further respect to any litigation arising hereunder, the

12         substantially prevailing party in any such action shall be

13         entitled to its reasonable attorneys' fees."

14

15     Alternatively, Plaintiffs may be entitled to recover their attorneys' fees and

16 costs incurred in defending an underlying suit pursuant to their implied indemnity

17 claims. *David Crystal, Inc. v. Cunard S.S. Co.*, 339 F. 2d 295, 300 (2d.

18 Cir.1964)(indemnitor required to pay indemnitee's attorneys' fees and

19 disbursements incurred in defending underlying suit); *Hermann C. Starck, Inc. v.*

20 *Finn Lines (Oy Finnlines Ltd.)*, 1978 A.M.C. 1330, 1340 (S.D.N.Y. 1978)("the

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1  courts have regularly required the indemnitor to reimburse the indemnitee for the
2  costs of defending the original suits"). *See also* CCP §1021.6.

3

4                                    Respectfully submitted,

5

6  Dated: March 27, 2009            COGSWELL NAKAZAWA & CHANG, LLP

7                                   By: /s/ Alan Nakazawa

8                                        Alan Nakazawa
                                         Ken Sato
9                                        Attorneys for Plaintiffs Alan Carpenter and
                                         Tracy Ragsdale
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF CONTENTIONS OF FACT AND LAW