Marilyn Raia (SBN 072320)
Norman J. Ronneberg, Jr. (SBN 68233)
Bullivant Houser Bailey PC
601 California Street, Suite 1800
San Francisco, California 94108
Telephone: 415-352-2700
Facsimile: 415-352-2701
E-Mail:marilyn.raia@bullivant.com
       norman.ronneberg@bullivant.com

Attorneys for Defendants
TUG MICHAEL UHL; MARITIME
LOGISTICS, INC.; FRANK LOVING; and
BLAINE HUGHES

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN CARPENTER AND TRACY RAGSDALE, individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>Tug MICHAEL UHL, her engines, machinery, tackle, equipment, furnishings and appurtenances, in rem, and MARITIME LOGISTICS, INC., FRANK LOVING, an individual and BLAINE HUGHES, an individual in personam,<br><br>Defendants. | Case No.: 07 CV 0166<br><br>**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Trial Date: April 27, 2009<br>Time: 9:00 AM<br>Judge: Hon. Dana Sabraw |

# TABLE OF CONTENTS

**Page**

I. CONTENTIONS OF FACT ................................................................................................. 1

II. CONTENTIONS OF LAW ............................................................................................... 8

    A. Federal maritime law governs ................................................................................ 8

    B. Maritime Logistics Inc. is entitled to indemnification from plaintiffs for the amount paid to the settle the government's claim. ........................................................ 9

    C. Overwhelming maritime case authority requires the owner of a towed vessel to make sure his vessel is seaworthy before the tow begins. Failure to do so is negligence. ...................................................................................................................... 9

    D. Judicial precedent defines the proper standard of conduct for a "reasonable" owner of a towed vessel ............................................................................................... 12

    E. Maritime law presumes the ALBION was unseaworthy at the time of her sinking because she foundered in fair weather and calm seas ................................... 12

    F. There is abundant proof plaintiffs negligently failed to tender a seaworthy vessel for towing even in the absence of a presumption. ........................................... 14

    G. Defendants' damages ............................................................................................ 15

        1. Maritime Logistics's damages are substantial. ............................................. 15

        2. Prejudgment interest ..................................................................................... 15

        3. Attorneys fees ............................................................................................... 16

    H. Under federal maritime law, a tugboat operator's liability is based on negligence. ............................................................................................................... 16

    I. The Tugboat Operator's on-scene decisions are not be judged in hindsight. ........... 17

    J. Maritime Logistics did not have duty to make the ALBION seaworthy, or to install or provide equipment on her to insure her seaworthiness ............................. 18

    K. Maritime Logistics was entitled to assume the ALBION was tendered in a seaworthy condition and could further rely on plaintiffs' representations regarding the ALBION's good condition. ................................................................. 19

    L. Because of Plaintiffs' duty to tender a seaworthy vessel, Maritime Logistics had no obligation to do more than a cursory inspection of the ALBION. ................ 20

    M. Maritime Logistics had no duty to constantly monitor the ALBION. ..................... 20

    N. Recoverable damages .......................................................................................... 21

        1. Plaintiffs cannot recover more than the market value of the ALBION immediately before she sank. ............................................................................ 21

        2. Plaintiffs cannot recover for their alleged emotional distress. ....................... 22

        3. Plaintiffs are not entitled to recover for the loss of use of the ALBION. .......................................................................................................... 22

        4. The principles of comparative fault apply to reduce any award in plaintiffs' favor. ................................................................................................ 22

III. CONCLUSION ............................................................................................................... 22

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# TABLE OF AUTHORITIES

Page(s)

CASES

*A.S. Wikstrom, Inc. v. THE TUG JULIA C. MORAN,*
190 F. Supp. 250 (S.D.N.Y. 1960) ........................................................................ 21

*American Dredging Co. v. Miller*
510 U.S. 443 (1994) ............................................................................................. 10

*American Home Assurance v. L & L Marine Inc.,*
688 F. Supp. 502 (E.D. Mo. 1988), *aff'd in pertinent part,* 875 F.2d 1351 (8th Cir.
1989) .................................................................................................................... 18

*Arkansas State Highway Comm'n v. Arkansas River Co.,*
271 F.3d 753 (8th Cir. 2001) ......................................................................... 10, 18

*Associated Dredging Co. v. Continental Marine Towing Co.,*
617 F. Supp. 961 (E.D. La. 1985) ........................................................................ 11

*Averbach v. Vnescheconombank,*
280 F. Supp. 2d 945 (N.D. Cal. 2003) ................................................................. 22

Beauchamp v. Los Gatos Golf Course,
273 Cal. App. 2d 20 (1969) ................................................................................. 12

*Cargill, Inc. v. C & P Towing Co.,*
1991 AMC 101 (E.D. Va. 1990), *aff'd,* 1992 AMC 392 (4th Cir. 1992) ...............
.................................................................................... 10, 11, 14, 17, 19, 20

*Carver v. Chevron U.S.A., Inc.,*
97 Cal. App. 4th 132 (2002) ................................................................................ 16

*Columbia Brick Works, Inc. v. Royal Ins. Co. of America,*
768 F.2d 1066 (9th Cir. 1985) ............................................................................. 15

*Commonwealth of Puerto Rico v. M/V EMILY S,*
1998 AMC 2020 (D. P.R. 1998) ............................................................................ 9

*Complaint of Bankers Trust Co.,* 651 F.2d 160, 171 (3d Cir. 1981) ............................. 14

*Complaint of Steuart Transp. Co.,* 435 F. Supp. 798, 804 (E.D. Va.1977), *aff'd,* 596 F.2d
609 (4th Cir. 1979) .............................................................................................. 20

*Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.,*
716 F.2d 1077 (5th Cir. 1983) ............................................................................. 13

*Dow Chemical Co. v. M/V GULF SEAS,*
428 F. Supp. 667 (W.D. La. 1977) ....................................................................... 20

– ii –

*Eckert v. United States,*
    232 F. Supp. 2d 1312 (S.D. Fla. 2002)....................................................................... 12

*Erlich v. Menezes,*
    21 Cal. 4th 543 (1999).................................................................................................. 22

*Esso Standard Oil, S.A. vs. S.S. Gasbras Sul,* 387 F.2d 573, 582 (2d Cir., 1968) ...................... 17

*Evergreen International, S.A. v. Norfolk Dredging Co.,*
    531 F.3d 302 (4th Cir. 2008)......................................................................................... 9

*Foremost Ins. Co. v. Richardson,*
    457 U.S. 668 (1982) ........................................................................................................ 8

*Fred Smartley,* 100 F.2d at 974.......................................................................................... 17

*Frederick Snare Corp. v. Moran Towing & Transp. Co.,*
    195 F. Supp. 639 (S.D.N.Y. 1961) ......................................................................... 11, 13

*Gainar v. S.S. LONGVIEW VICTORY,*
    226 F. Supp. 912 (E.D. Va. 1964)............................................................................... 19

*Hart v. Blakemore,*
    410 F.2d 218 (5th Cir. 1969)........................................................................................ 11

*Hudson Valley Lightweight Aggregate Corp. v. Windsor Building & Supply,*
    309 F. Supp. 1274 (S.D.N.Y. 1969) ........................................................................... 13

*Hunley v. Ace Maritime Corp.,*
    927 F.2d 493 (1991) ...................................................................................................... 10

*In re Christiansen Marine, Inc.,*
    1966 AMC 2353 (E.D. Va. 1996) .............................................................................. 20

*In re Christiansen Marine, Inc.,*
    1996 AMC 2353 (E.D. Va. 1996) ........................................................... 11, 12, 14, 15

*In re Seaboard Shipping Corp.*
    1971 AMC 242 (S.D.N.Y. 1970) ............................................................................... 17

*In re Tug Beverly, Inc.,*
    1994 AMC 2437 (E.D. Pa. 1994)....................................................................... 10, 14, 15

*J.C. Gury Co. v. Nippon Carbide Industries (USA), Inc.,*
    152 Cal. App. 4th 1300 (2007)..................................................................................... 16

*Kenny Marine Towing, Inc. v. M/V JOHN R. RICE,*
    583 F. Supp. 1196 (E.D. La. 1984) ...................................................................... 11, 19

*Kentucky Fried Chicken of Cal., Inc. v. Superior Court,*
    14 Cal. 4th 814 (1997)................................................................................................... 12

– iii –

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*Kossick v. United Fruit Co.*,
  365 U.S. 731 (1961) .................................................................................. 10

*M.P. Howlett v. Tug Michael Moran*
  1970 AMC 783 (2d Cir. 1970) ................................................................... 18

*Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*,
  959 F.2d 49 (5th Cir. 1992) ....................................................................... 12

*Marina Mgmt. Group, Inc. v. Basic Towing, Inc.*,
  2003 U.S. App. LEXIS 10863 (6th Cir. 2003) .......................................... 19

*Massman Constr. Co. v. Sioux City & New Orleans Barge Lines*,
  462 F. Supp. 1362 (W.D. Mo. 1979) .................................................. 11, 21

*May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft*,
  290 U.S. 333, 350 (1933) ........................................................................... 10

*McDermott Inc. v. AmClyde*,
  1997 AMC 692 (E.D. La. 1996) ........................................... 9, 10, 13, 18

*McDermott, Inc. v. AmClyde*,
  511 U.S. 202 (1994) ..................................................................................... 9

*McDermott Int'l v. Wilander*,
  498 U.S. 337 (1991) .................................................................................. 10

*McMellon v. United States*,
  395 F. Supp. 2d 423 (S.D. W. Va. 2005) ................................................. 12

*Nat G. Harrison Overseas Corp. v. American Tug Titan*,
  516 F.2d 89 (5th Cir. 1975), modified ..................................................... 20

*New Orleans Coal & Bisso Towboat Co. v. United States*,
  86 F.2d 53 (5th Cir. 1936) ........................................................................ 18

*Oppen v. Aetna Ins. Co.*,
  485 F.2d 252 (9th Cir. 1973) ................................................................... 22

*Parrillo v. Commercial Union Ins. Co.*,
  85 F.3d 1245 (7th Cir. 1996) ................................................................... 22

*Patel v. United States*,
  806 F. Supp. 873 (N.D. Cal. 1992) ......................................................... 22

*Prado, Inc. v. Lexington Ins. Co.*,
  1990 AMC 2782 (D. Mass. 1990) ............................................................ 13

*Romero v. Int'l Terminal Operating Co.*,
  358 U.S. 354 (1959) .................................................................................. 10

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*Schuylkill Transp. Co. v. Banks,*
    152 F.2d 405 (3d Cir. 1945) ............................................................................ 20

*Shebby Dredging Co. v. Smith Bros., Inc.,*
    469 F. Supp. 1279 (D. Md. 1979) ......................................................... 16, 17

*South, Inc. v. Moran Towing & Transp. Co.,*
    360 F.2d 1002 (2d Cir. 1966) ............................ 10, 13, 17, 18, 21

*Southgate v. Eastern Transp. Co.,*
    21 F.2d 47 (4th Cir. 1927) .............................................................. 11, 16

*Standard Oil Co. of New Jersey v. Southern Pac. Co.,*
    268 U.S. 146 (1925) ............................................................................ 21

*Star Towing Co. v. Barge ORG-6504,*
    301 F. Supp. 819 (E.D. La. 1969) ................................................... 19

*Stevens v. East-West Towing Co.*
    649 F.2d 1104 (5th Cir. 1981) .......................................................... 19

*Stevens v. The WHITE CITY,*
    285 U.S. 195 (1932) ...................................................................... 16, 17

*Stewart v. Dutra Constr. Co.,*
    543 U.S. 481 (2005) ........................................................................... 10

*The DOYLE,* 105 F.2d 113, 116-117 (3d Cir. 1939). ............................... 11, 14

*The EDMUND L. LEVY,* 128 F. 683, 684 (2d Cir. 1904) .......................... 10

*The Fred Smartley, Jr.,* 100 F.2d 971, 973 (4th Cir. 1939) ...................... 14

*The IMOAN,* 67 F.2d 603, 605 (2d Cir. 1933) ........................................ 17

*The RADNOR,* 21 F.2d 982, 983 (D. Md. 1927) ...................................... 16

*The T.J. HOOPER,* 60 F.2d 737 (2d Cir. 1932) ...................................... 18

*Theriot v. Dawson Production Services, Inc.,*
    1998 U.S. Dist. LEXIS 14932 (E.D. La. 1998) ............................ 20

*Tidewater Marine, Inc. v. Sanco Int'l, Inc.,*
    113 F. Supp. 2d 987 (E.D. La. 2000) .......................................... 21

*Torres v. M/V FUICINO FISHING VESSEL,*
    141 F. Supp. 2d 1028 (S.D. Cal. 2001) ....................................... 10

*Trans-Tec Asia v. M/V HARMONY,*
    518 F.3d 1120 (9th Cir. 2008) ...................................................... 10

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*United States v. Reliable Transfer Co.,*
  421 U.S. 397 (1975) ........................................................................................ 9, 22

*Wallis v. Princess Cruises, Inc.,*
  306 F.3d 827 (9th Cir. 2002) ................................................................................. 10

*Western Pacific Fisheries, Inc. v. SS PRESIDENT GRANT,*
  730 F.2d 1280 (9th Cir. 1984) ............................................................................... 15

STATUTES

33 U.S.C. § 2701(17) ............................................................................................... 9

33 U.S.C. § 2702(d)(1) ............................................................................................. 9

Clean Water Act, 33 U.S.C. § 1321 ......................................................................... 9

Comprehensive Environmental Response, Compensation and Liabilities Act, 42 U.S.C.
  § 9001 *et seq.* ...................................................................................................... 15

National Marine Sanctuaries Act, 16 U.S.C. § 1431 *et seq.* ................................. 15

Oil Pollution Act of 1990 ("OPA 90"), 33 U.S.C. § 2701 *et seq.* ................... 9, 15

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Defendants submit the following memorandum of contentions of fact and law:

## I. CONTENTIONS OF FACT

Plaintiffs were the owners of a 40 year old 52' wooden vessel named ALBION. Although the ALBION was a De Fever designed vessel, she was not a "classic" or "collector" boat. Plaintiffs had purchased the ALBION in <u>1998 or 1999</u> at a salvage sale for $20,000. She had been abandoned by her prior owner in Mexico and was towed to San Diego. When the prior owner failed to pay the towing charges, the towing company sold the ALBION to plaintiffs in a lien/salvage sale. The ALBION was at Nielsen Beaumont Boatyard in San Diego when plaintiffs purchased her.

The ALBION's hull was not built in the usual time-tested manner i.e. Carvel-planked.[1] Instead, it was "bead and cove strip-planked"[2] – a construction method known to result in lighter, weaker, and short-lived hulls.

Before her sale to plaintiffs, the ALBION had undergone some basic maintenance to increase her potential for sale. That maintenance did not, however, enhance the ALBION's value. Plaintiffs purchased the ALBION with the intent of restoring her as a retirement project.

The ALBION's wooden hull was significantly deteriorated with a fungus (or rot) that extensively diminished its overall strength and seaworthiness of the members. The rot was not visible because Carpenter painted it over. Although plaintiff Carpenter was not an experienced wooden boat repairer, he undertook hull repairs in a method that was unconventional and less than competent. He also removed all of the vessel's interior accommodations to his home. They were later destroyed in a fire there.

---

[1] When a wooden vessel is Carvel-planked, the longitudinal planks are nailed onto steam bent or sawn frames. A Carvel-planked vessel is held together with fasteners, not glue. An advantage to Carvel planking is the ability to remove and replace a plank easily.

[2] Bead and cove strip-planking involves planks with convex and concave edges that nest together like a ball and socket. A strip planked vessel is held together with glued seams between the planks, with edge-driven ring-shanked boat nails spaced 8-10 inches apart. A strip planked vessel is difficult to repair because once a plank is removed, it is impossible to replace it in the same nesting fashion unless the entire hull is disassembled. A plank that is replaced in a bead and cove construction vessel will have a straight edge that will not nest with the adjacent planks. Further, if a leak develops between the planks, the edge-driven nails cannot be removed and must be cut.

1     Plaintiffs eventually installed two allegedly rebuilt, but obsolete, Gray Marine 2-stroke

2     diesel 671 engines to the ALBION.[3]  Minimal other machinery was also added but neither the

3     engines nor the other machinery enhanced the ALBION's value.

4         After doing some preliminary work on the ALBION, plaintiffs essentially abandoned her

5     at the Nielsen Beaumont dock for approximately five years.  Carpenter paid $540 per month to

6     moor the vessel at Nielsen Beaumont but in all the time she was there, she was never taken

7     away from the dock.  On occasion, Carpenter went aboard the ALBION to start her engines; he

8     routinely left them running for a few hours while he left the boatyard to do other things.   While

9     at the Nielsen Beaumont boatyard, the ALBION was moored under the office window of

10    defense expert Todd Schwede and just a few slips away from his houseboat.

11        In January 2005, plaintiffs decided to take the ALBION to a still-unidentified boatyard

12    in Reedsport, Oregon for further work.  Because the ALBION had no interior accommodations

13    and minimal machinery, she was unable to make the voyage to Reedsport, Oregon under her

14    own power.   Instead, plaintiffs decided to have her towed.

15        Plaintiffs first contacted the towing company that had towed the ALBION from Mexican

16    waters.  That company declined because of the ALBION's poor condition and its experience

17    with having to continuously pump the ALBION during the voyage from Mexico.

18        Plaintiffs next contacted Maritime Logistics, a tug company headquartered in Morro

19    Bay, CA.  Carpenter represented to Maritime Logistics's president, Capt. Frank Loving, the

20    ALBION had been extensively refurbished and was fit for the tow.  He also told Capt. Loving

21    the ALBION was so tight as to be "unsinkable".  Capt. Loving went aboard the ALBION and

22    inspected the interior of the vessel.  He noted the interior of the vessel had been "gutted" and

23    that minimal equipment was aboard.  Capt. Loving also noted the vessel's bilges contained only

24    the expected, small amounts of water.

25

26    [3] The Gray Marine 2-stroke diesel engines were built in the 1940's and 1950's and were
      commonly used during World War II on a variety of military vessels. They are no longer
27    allowed on commercial vessels in California. When they became prohibited in California, they
      were removed from commercial vessels and placed in salvage yards for sale for other uses.
28    Carpenter bought the engines that he put on the ALBION from one such salvage yard in
      Wilmington, CA which he contends is no longer in business.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    Relying on Carpenter's representations about the ALBION and in particular, the

2    representations about the extensive refurbishing he had done, Maritime Logistics agreed to

3    undertake the more than 800 mile tow with its 87' oceangoing tug, MICHAEL UHL, for a fee of

4    $36,000.

5        Maritime Logistics presented a proposed written towage contract to plaintiffs reflecting

6    their agreement. Plaintiffs took the proposed agreement home for further review by plaintiff

7    Tracy Ragsdale, an attorney and plaintiff Alan Carpenter's wife. A few days later and after

8    making some changes, they signed it and gave it back to Capt. Loving.

9        At paragraph 3 B., the towage contract expressly required plaintiffs to exercise due

10   diligence to make the ALBION seaworthy for the tow:

11           Customer warrants it shall use due diligence to tender the Tow at
             the start port/place in a seaworthy condition....
12

13       As will be explained by plaintiff's own experts, certain things were not done to place the

14   ALBION in a seaworthy condition before being tendered for towing. Although plaintiffs'

15   experts erroneously attempt to cast the burden of doing those things on Maritime Logistics, that

16   burden is, as a matter of law, imposed on plaintiffs. Further, no effort was undertaken by

17   plaintiffs to have the ALBION surveyed to determine whether she was actually in a seaworthy

18   condition before being represented as such and tendered to Maritime Logistics for towing.

19       Although he had no legal obligation to do so, before the tow departed San Diego, Capt.

20   Loving requested the portholes be covered securely to prevent the ingress of water. He also

21   requested the bow windows be boarded up to prevent damage by shipping seas. Plaintiffs and

22   their friends did that work.

23       Despite the recommendation of Capt. Loving to ballast the ALBION with water,

24   plaintiffs chose to ballast the ALBION with diesel fuel. They filled the fuel tank with 1,400

25   gallons of diesel fuel because plaintiffs wanted to avoid the cost of cleaning the water from the

26   fuel tank when the vessel arrived in Oregon.

27

28

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1       The crew of the MICHAEL UHL checked and inspected the ALBION before leaving

2 San Diego. From what they could see, she appeared to be in a seaworthy condition. Crewman

3 Barry Lambert noted the shafts from both engines were "dogged."[4]

4       The towing gear prepared by Maritime Logistics was comprised of a bridle, primary and

5 secondary tow lines and protective devices, an appropriate arrangement according to both

6 defendants' and plaintiffs' experts.

7       The tow departed San Diego on January 21, 2005 under the command of Capt. Loving, a

8 Coast Guard-licensed tugboat captain. On January 23, 2005, the tow arrived without incident in

9 Morro Bay, CA. It remained in Morro Bay until January 29, 2005 due to marine weather

10 forecasts which predicted inclement and unsafe weather. While at Morro Bay, the ALBION

11 remained tethered to the tug MICHAEL UHL. Nothing in the towing equipment or its

12 configuration was changed. Both vessels remained tied up together at the dock.

13       On January 29, 2009, when the weather had greatly improved, Coast Guard- licensed

14 captain Blaine Hughes (who was employed by Maritime Logistics) assumed command of the

15 tow and departed Morro Bay. When the tow departed, the ALBION was riding with proper

16 freeboard and trim. Until January 30, 2005, at 1800 hours (6:00 PM), the ALBION rode evenly

17 and straight behind the MICHAEL UHL on 1,300 feet of towing wire. The weather was ideal

18 for the voyage with little wind and calm seas. Capt. Hughes checked the towing gear, winches,

19 and the ALBION every hour. His deckhand, Barry Lambert, also checked the ALBION on a

20 regular basis. Nothing was awry.

21       At approximately 2000 hours (8:00 PM) on January 30, 2005 or approximately thirty

22 minutes after his last check of the ALBION, Capt. Hughes was seated at the navigation table in

23 the wheelhouse facing aft, working on navigation. Deckhand Barry Lambert was seated at the

24 wheel facing forward. In the dark, Capt. Hughes could see the running lights on the ALBION

25 and noticed the ALBION starting to yaw.[5] He saw her move to the maximum range of the

26

27 [4] "Dogging" the shafts means to secure them so they do not spin when the vessel is towed through the water. If the shafts spin when the engine is not engaged, the transmissions can be damaged. (By analogy, it is like securing the wheel of a bicycle that is on a rack on the back of a car to prevent it from spinning when the car is being driven.)

28 [5] "Yaw" is a nautical term meaning move from side to side.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  towing wire and then be pulled back in the opposite direction. Capt. Hughes could also "feel"

2  that the tow was suddenly behaving strangely. He immediately decreased the speed of the

3  MICHAEL UHL from 5.5 kts to bare steerage and illuminated the ALBION with the tug's

4  spotlights. He noticed the ALBION was quite a bit "down by the bow".[6] The sudden yawing,

5  the lower level of the bow and the different "feel" meant to him the ALBION was rapidly taking

6  on water.

7        Capt. Hughes sounded the general alarm aboard the MICHAEL UHL and woke up the

8  other crew members who were off duty on their rest periods. The towing wire was pulled in and

9  the ALBION was brought to approximately thirty to forty feet behind the MICHAEL UHL.

10  Capt. Hughes and the other crewmembers were unable to determine from their vantage point

11  even with spotlights, what was causing the ALBION to take on water.

12        The ALBION's decks became totally awash quickly thereafter. Capt. Hughes

13  determined it would not be safe to transfer a crewmember from the MICHAEL UHL to the

14  ALBION with a pump under the circumstances, i.e. in the dark, in the Pacific Ocean miles from

15  shore with the deck of the ALBION awash. In a very short while, the ALBION became totally

16  submerged, though she remained within fifty feet of the ocean surface, not touching the bottom.

17        Capt. Hughes communicated with the Coast Guard by radio. It was determined he should

18  continue towing the ALBION to the nearest safe harbor, Monterey, which was 24 miles away.

19  Capt. Hughes believed the MICHAEL UHL could continue to tow the submerged ALBION to

20  port where the vessel could be raised. The ALBION was not touching the bottom but traveling

21  through the water, her wooden hull providing some buoyancy.

22        Capt. Hughes and the other crewmembers observed the flybridge of the ALBION 'blow

23  up" or break away from the hull and float away. Nonetheless, the tow continued toward

24  Monterey at slow speed, Capt. Hughes still believing he could bring the ALBION to the harbor

25  where a salvage crew was standing by.

26

27

28  [6] "Down by the bow" is a nautical term meaning that the vessel is not level and the bow or front
end is lower in the water.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    When the tow was less than one mile from and in view of its intended safe harbor,
2  armed federal marine sanctuary police on boats met the tow and ordered it to stop,
3  countermanding the order from the Coast Guard to bring the vessel to Monterey. When Capt.
4  Hughes told them what the Coast Guard had ordered and that the tow could be saved, the police
5  unstrapped their guns. Believing he was being threatened with bodily harm, Capt. Hughes
6  stopped the progress of the tow.

7    The towing wire was later cut and the ALBION sank to the bottom of Monterey Bay in
8  approximately 185 feet of water. The bottom was, for the most part, sandy.

9    Immediately after the sinking, part of the ALBION's wooden structure broke away and
10  floated to the surface of the water. A crewmember from the MICHAEL UHL retrieved and
11  retained a board from that part of the hull, which he saw was riddled with wood rot. A
12  subsequent inspection by defense wood expert Prof. Steve Quarles confirmed this piece of wood
13  and pieces of wood later taken from the vessel, were rotten.

14    The MICHAEL UHL was ordered to stand by at anchor pending further orders from the
15  Coast Guard. Eventually the MICHAEL UHL was moved to the Coast Guard dock and
16  provided some assistance with the diving efforts to retrieve the sunken ALBION.

17    Before the MICHAEL UHL departed the area, Coast Guard officers met with Capt.
18  Loving and the Maritime Logistics crewmembers. The Coast Guard officers commended the
19  crewmembers on the actions taken in the incident and advised Capt. Loving the incident would
20  likely be used as a "test case" to teach what would be a "perfect example" of a proper response
21  to an incident. In particular, they noted how Maritime Logistics acted properly in all aspects of
22  the matter including communications with the Coast Guard. Although Maritime Logistics filed
23  the required CG-2692 casualty report form, the Coast Guard did not bring proceedings against
24  the licenses of Capt. Loving or Capt. Hughes concluding there was no negligence or violation of
25  law.

26    During the initial efforts to raise the ALBION within a day or two of its sinking 18,000
27  pound lift bags were attached to the ALBION's hull and chained to the rudder posts by divers
28  employed by Vessel Assist, a company out of Monterey hired by plaintiffs to salvage the

– 6 –

ALBION. That company did not competently perform its work and caused damage to the ALBION. The ALBION's hull was simply too deteriorated and not sufficiently strong to be raised in the manner attempted and the hull cracked where the lift bags had been attached.

A video taken of the ALBION approximately ten days after the sinking, and after the initial attempt to raise her, shows her leaning on her port side on a sandy bottom with much of the cabin and flybridge missing. The video also reveals the very poorly refurbished condition of the hull of the ALBION, with "proud" planks[7] and visible rot, despite representations of Carpenter to Capt. Loving about the ALBION's excellent condition before the tow began.

The United States declared Carpenter and Ragsdale to be "responsible parties" under federal pollution law and, therefore, strictly liable for the amount of pollution cleanup costs because they were the owners of the ALBION. Using a novel "flotilla" theory, the government also declared Maritime Logistics to be a responsible party, though it was neither the owner nor operator of the potentially polluting ALBION. The United States government then ordered the parties to remove the wreck of the ALBION and abate the pollution from the diesel fuel Carpenter put in the ALBION's fuel tanks. Allstate, the insurer of the ALBION, on behalf of Carpenter, was notified of the incident but failed to take appropriate steps to have the ALBION raised from the bottom. Plaintiffs did not take appropriate steps to raise the ALBION either. Maritime Logistics was unable to unilaterally raise the ALBION. Because it did not own her, it could not contract for her removal.

The United States eventually assumed responsibility for the removal of the wreck of the ALBION. After incurring expenses of more than $1.2 million, the United States determined the ALBION could not be removed from the bottom. The vessel was in too poor condition and simply fell apart. The remaining diesel was, however, able to be siphoned off. The engines and other machinery parts, as well as hull fragments, were removed from the bottom. The shafts were cut free from the engines to facilitate their removal.

---

[7] Planks that are "proud" are not flush and smooth along the surface of the vessel's hull. Planks become "proud" when they are not properly maintained and become rotted.

The United States made a strict liability claim against plaintiffs and defendants for the costs incurred in connection with its unsuccessful efforts to remove the ALBION. There was no evidence then, and there still is no evidence, of any negligence by Maritime Logistics or its employees.

The government's claim was eventually settled on a without prejudice basis between plaintiffs and defendants. A payment of $1,310,295.25 was made on behalf of Maritime Logistics. to the United States to settle the strict liability claim against it. Allstate made a much smaller payment on behalf of plaintiffs. Plaintiffs themselves paid absolutely nothing in settlement of the government's claim. The settlement agreement preserved the rights of the settling parties to seek indemnity from each other.

Allstate also paid $170,000 directly to plaintiffs, which was the insured value of the ALBION but far more that she was worth. Maritime Logistics lost its towing gear, valued at $15,000, which was not reimbursed by insurance.

Plaintiffs filed a "bad faith" claim against Allstate and in settlement of that claim received an assignment of Allstate's subrogation claim against Maritime Logistics.

Plaintiffs filed suit against defendants in January 2007 in their own name but asserting Allstate's subrogation claim because they themselves had not suffered any financial loss. Maritime Logistics filed a cross complaint for its damages including reimbursement of the amount paid to settle the government's claim.

## II. CONTENTIONS OF LAW

### A.    Federal maritime law governs

This action is governed by federal maritime law because it involves an alleged tort in the navigable waters of the United States. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 676-677 (1982).

# DEFENDANTS'/CROSS-COMPLAINANTS' CASE AGAINST PLAINTIFFS[8]

**B.** **Maritime Logistics Inc. is entitled to indemnification from plaintiffs for the amount paid to the settle the government's claim.**

The Clean Water Act, 33 U.S.C. § 1321, makes it illegal to allow the release or threatened release of oil-based pollutants into American waterways. The Act, when read together with the Oil Pollution Act of 1990 ("OPA 90"), 33 U.S.C. § 2701 *et seq.*, makes the owner or operator of a polluting vessel strictly liable, as Responsible Party, for specified removal/abatement costs, damages, etc., 33 U.S.C. § 2701(17) and 33 U.S.C. § 1321. Though Maritime Logistics did not own nor operate the ALBION, the Coast Guard declared Maritime Logistics to be a secondary "responsible party" under a novel "flotilla" theory advanced by only one court in the United States.[9]

OPA 90 expressly allows Maritime Logistics to seek 100% indemnification from the ALBION's owners if there is no fault on its part. 33 U.S.C. § 2702(d)(1). And, under general maritime law, if both plaintiffs and defendants bear some measure of fault, Maritime Logistics is entitled to recover that portion of the monies it paid to the United States in proportion to the percentage of Plaintiffs' negligence. See e.g., *Evergreen International, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 307, 312 (4th Cir. 2008), and *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 207 (1994)(citing *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975)("when two or more parties have contributed by their fault to cause…damage…[liability] is to be allocated among the parties proportionately to the comparative degree of their fault").

**C.** **Overwhelming maritime case authority requires the owner of a towed vessel to make sure his vessel is seaworthy before the tow begins. Failure to do so is negligence.**

For more than 100 years, admiralty courts have agreed it is the owner of the towed vessel (not the tugboat operator[10]) who is obliged to make sure his vessel is seaworthy and

---

[8] Because the value of Defendants' cross-complaint against Plaintiffs is significantly greater than Plaintiffs' claim, and because the same principles of maritime law govern both sides' claims, Defendants open their memorandum of facts and law with Defendants' claims against Plaintiffs.

[9] *Commonwealth of Puerto Rico v. M/V EMILY S*, 1998 AMC 2020, 2022 (D. P.R. 1998).

[10] "It is not the duty of the tug to make the tow and her cargo seaworthy, it is the direct duty of the owner of the tow." *McDermott Inc. v. AmClyde*, 1997 AMC 692, 701 (E.D. La. 1996)

physically capable of carrying out the anticipated voyage. This is an "absolute duty." *Cargill, Inc. v. C & P Towing Co.*, 1991 AMC 101, 108 (E.D. Va. 1990), *aff'd*, 1992 AMC 392 (4th Cir. 1992).[11] It is also non-delegable. *In re Tug Beverly, Inc.*, 1994 AMC 2437, 2440 (E.D. Pa. 1994). The towed vessel owner's failure to do so is negligence. 8 Benedict [12](7th Ed. Rev.), Towage, sec. 14.06[1]:

> "A party offering a vessel for towing warrants its seaworthiness. As such, it represents the vessel as being sufficiently tight and strong to weather the ordinary perils of the contemplated voyage. The implied warranty reflects the law's conclusion that the tow owner generally is the party best able to know the tow's condition and limitations and what must be done to prepare it for the voyage."

See *Arkansas State Highway Comm'n v. Arkansas River Co.*, 271 F.3d 753, 758 (8th Cir. 2001)[a vessel owner tendering a vessel for towage to a towing company warrants the seaworthiness of that vessel]; *South, Inc. v. Moran Towing & Transp. Co.*, 360 F.2d 1002, 1005 (2d Cir. 1966)[It is "settled that the owner of a tow is responsible for its seaworthiness and warrants that she is sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage."]; and *The EDMUND L. LEVY*, 128 F. 683, 684 (2d Cir. 1904); *McDermott*, 1997 AMC at 701 ("The owner of the tow must provide a vessel to be towed which is structurally sound in all respects").

---

[11] "AMC" (American Maritime Cases) is a compilation of most of the federal and state maritime law opinions in the United States and Canada. Cases reported only in AMC are regularly cited to by **all** courts sitting in admiralty. See e.g., *American Dredging Co. v. Miller* 510 U.S. 443, 468-469 (1994); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354(1959); *May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft*, 290 U.S. 333,350 (1933); *Trans-Tec Asia v. M/V HARMONY*, 518 F.3d 1120, 1130 (9th Cir. 2008); *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 839 (9th Cir. 2002); *Hunley v. Ace Maritime Corp.*, 927 F.2d 493, 496 (1991); and *Torres v. M/V FUICINO FISHING VESSEL*, 141 F. Supp. 2d 1028, 1031 (S.D. Cal. 2001). The Southern District of California Court Library has a complete set of American Maritime Cases available for reference.

[12] Benedict has been recognized by the US Supreme Court as the "leading admiralty treatise," *McDermott Int'l v. Wilander*, 498 U.S. 337, 344 (1991) and is often cited as authoritive by the Supreme Court. See e.g., *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489-90 (2005) and *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961).

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

In *Associated Dredging Co. v. Continental Marine Towing Co.,* 617 F. Supp. 961, 965 (E.D. La. 1985), the court summarized governing maritime law:

> "In a contract of towage, the owner of the barge warrants that the vessel offered for towage is sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage...If the tow is unseaworthy by reason of weakness, decay, or leaks and such defects are not obvious to the master of the tug, the tug will be absolved from responsibility for such unseaworthiness if it is the cause of the damage complained of. This principle is commonly referred to as the warranty of seaworthiness."

The court in *Cargill* explained the logic of the rule:

> The absolute duty to provide a seaworthy tow is based upon the fact that the "tug does not have exclusive control over the tow but only so far as is necessary to enable the tug and those in charge of her to fulfill the engagement...The owner of a tow has exclusive control over the condition of its vessel; additionally, the owner of a tow is in the best position to know of the tow's defects and to inform the tug of those defects. In fact, the owner of a tow has "an affirmative duty to advise the tug of any conditions which might affect the safety of the towing movement....[citations and interior quotes omitted]

*Cargill,* 1991 AMC at 108.

See also, *Hart v. Blakemore,* 410 F.2d 218, 221-222 (5th Cir. 1969); *Southgate v. Eastern Transp. Co.,* 21 F.2d 47, 49 (4th Cir. 1927); *Kenny Marine Towing, Inc. v. M/V JOHN R. RICE,* 583 F. Supp. 1196, 1198 (E.D. La. 1984); *Massman Constr. Co. v. Sioux City & New Orleans Barge Lines,* 462 F. Supp. 1362, 1368 (W.D. Mo. 1979); *Frederick Snare Corp. v. Moran Towing & Transp. Co.,* 195 F. Supp. 639, 642 (S.D.N.Y. 1961).

The warranty of seaworthiness exists for the benefit of the tower. Benedict, *supra,* at sec. 14.04[2].

Unseaworthiness gives rise to negligence, when it relates to a condition of the vessel, which renders her unfit for her intended voyage...." *In re Christiansen Marine, Inc.,* 1996 AMC 2353, 2364 (E.D. Va. 1996). See also, *The DOYLE,* 105 F.2d 113, 116-117 (3d Cir. 1939). As the Court in *Cargill* explained, a tow owner's failure to provide a tug with a seaworthy tow amounts to negligence.

As discussed in greater detail below, plaintiffs failed to tender a seaworthy vessel to Maritime Logistics for towing. Accordingly, they were negligent.

– 11 –

**D.** **Judicial precedent defines the proper standard of conduct for a "reasonable" owner of a towed vessel**

Although common law tort principles govern ordinary maritime actions, <u>in the "tug-tow situation, the case law provides more specific direction as to the meaning of negligence</u>...."
*Christiansen Marine*, 1996 AMC at 2363 (emphasis added).

It is axiomatic settled case precedent establishes the proper standard of care or standard of conduct in a negligence action. See Restatement 2nd of Torts, sec. 285 ("How Standard of Conduct is Determined"), which provides that: "The standard of conduct of a reasonable man may be (a) established by a legislative enactment or administrative regulation which so provides, or (c) <u>established by judicial decision</u>" [emphasis added]. See also Comment e to the aforesaid Restatement:

> "To the extent that the decision declares particular conduct to be up to or below the socially required standard, it defines the conduct of the reasonable man and narrows the field in which the opinion of the trial judge or jury is operative.........."

Maritime courts frequently look to the Restatement of Torts rule, when determining applicable tort standards. See, for example, *Christiansen Marine,* 1996 AMC at 2363 [case law delineates meaning of negligence in tug-tow context]; *Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49 (5th Cir. 1992); *McMellon v. United States*, 395 F. Supp. 2d 423 (S.D. W. Va. 2005); *Eckert v. United States*, 232 F. Supp. 2d 1312, 1320 (S.D. Fla. 2002)[standard of care arises from judicial decisions].[13]

**E.** **Maritime law presumes the ALBION was unseaworthy at the time of her sinking because she foundered in fair weather and calm seas**

Ordinarily, it would be Defendant/Cross-Complainants' burden to establish Plaintiffs' negligence in offering an unseaworthy vessel to the Tug MICHAEL UHL. When, however, a tow sinks in fair weather and calm seas, an evidentiary presumption arises that plaintiffs' 40

---

[13] California courts also frequently hold that judicial decisions properly describe and limit a tortfeasor's standard of conduct. See e.g. *Kentucky Fried Chicken of Cal., Inc. v. Superior Court*, 14 Cal. 4th 814, 824 (1997), which explained that ordinarily, the standard of care in a negligence case is what a reasonably prudent person would do under similar circumstances. However, "in particular circumstances, a more specific standard of care may be established by judicial decision...."; and *Beauchamp v. Los Gatos Golf Course*, 273 Cal. App. 2d 20, 26-27 (1969)[Judicial decisions establish standard of conduct of possessor of land towards invitees].

— 12 —

year old wooden boat was unseaworthy at the time of the casualty. See *Moran Towing*, 360 F.2d at 1005, where the Second Circuit explained "there is a presumption that a vessel which is lost under normal conditions, with fair weather and calm seas, as was the case here, was unseaworthy in the absence of proof that she was improperly handled"; *Frederick Snare Corp.*, 195 F. Supp. at 642 ("[A] tow is presumed to be unseaworthy when she sinks under normal conditions, and in the absence of proof that she was improperly handled); and *McDermott*, 1997 AMC at 701.["In fact, where a tow sinks or suffers some other failure under normal conditions, there is a presumption that the tow was unseaworthy in the absence of proof of improper handling.']

To overcome this presumption of unseaworthiness, the tow owner bears the burden of proving his vessel was in good condition, and that he exercised due diligence in maintaining a seaworthy vessel. *Prado, Inc. v. Lexington Ins. Co.*, 1990 AMC 2782, 2784-2785 (D. Mass. 1990); and *Hudson Valley Lightweight Aggregate Corp. v. Windsor Building & Supply*, 309 F. Supp. 1274, 1277 (S.D.N.Y. 1969). It is not enough for the tow owner to show he has spent a great deal of money on repairs and upkeep, if his expenditure has not resulted in a seaworthy vessel. *Prado*, 1990 AMC at 2784-2785. As the Fifth Circuit explained in *Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F.2d 1077, 1081 (5th Cir. 1983):

> "Where, as here, a barge in tow sinks in calm water for no immediately ascertainable cause, the law translates these duties into burdens of proof: in the absence of proof that the barge was improperly handled, the vessel's sinking is presumed to be a <u>direct result</u> of her unseaworthiness." [emphasis added]

Accordingly, because no act or omission of Defendants caused the foundering of the ALBION, and the vessel sank in fair weather and calm seas; 1) Plaintiffs are presumed to have negligently given an unseaworthy tow to the Tug MICHAEL UHL; and 2) the ALBION's sinking is presumed to have been a "direct result" (i.e. the proximate cause) of her unseaworthiness. See *Marcona Conveyor*, 716 F.2d at 1081.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

**F.** **There is abundant proof plaintiffs negligently failed to tender a seaworthy vessel for towing even in the absence of a presumption.**

Evidence at trial---including particularly damning photographs and videotapes---will establish conclusively that the 40 year old ALBION was unseaworthy. Her timbers and planks were riddled with rot prior to January 30, 2005. Poorly performed and substandard repairs to the vessel's hull had further compromised the vessel's strength. Her unusually cheap mode of construction (bead and cove strip-planking) is now disfavored because it is known to result in wooden boats that are relatively short-lived. Any one of these problems can produce an unseaworthy vessel. Collectively, they prove the ALBION was an unseaworthy "accident waiting to happen."

As noted above, plaintiffs had a non-delegable duty to furnish Maritime Logistics with a vessel fit for her intended tow from San Diego to Oregon. *Tug Beverly*, 1994 AMC at 2439-2440. Maritime law holds plaintiffs to be in the best position to know the condition of their vessel. See Benedict, supra, at 14.06[1] and *Tug Beverly*, 1994 AMC at 2439-2440. It was plaintiffs, not defendants, who were required to repair their vessel before the tow. *Cargill*, 1991 AMC at 117 n.24. It was plaintiffs, not defendants who were obligated to properly outfit the ALBION with the necessary equipment. It was plaintiffs, not defendants, who were obliged to inspect the ALBION to find any leaks or weak spots. *The Fred Smartley, Jr.*, 100 F.2d 971, 973 (4th Cir. 1939). When the owner of a towed vessel is aware there is serious rot in his vessel's hull planks---i.e. some planks were soft enough you could sink a knife in...the owner is deemed to have notice of his vessel's unseaworthy condition. *The DOYLE*, 105 F.2d at 116-117. "[T]o send her out in that condition constituted the failure to exercise reasonable care."] *Id.* at 117.

Furthermore, the owner of the towed vessel is not allowed to claim ignorance of his vessel's defects, if he was in a position to discover those defects. As the Third Circuit explained in *Complaint of Bankers Trust Co.*, 651 F.2d 160, 171 (3d Cir. 1981), it is "well settled that a shipowner has a duty to use reasonable means to acquire knowledge calculated to inform him of conditions likely to produce or contribute to unseaworthiness". See also, *In re Christiansen Marine, Inc.*, 1996 AMC 2353 (E.D. Va. 1996), a tugboat case in which the court explained 1) a shipowner is chargeable with knowledge of acts or events or conditions of unseaworthiness that

– 14 –

1 could have been discovered through reasonable diligence and 2) "the shipowner's knowledge of
2 the conditions is irrelevant because he has a nondelegable duty to furnish a vessel that is fit for
3 its intended purpose." *Id.* at 2356-2357. And, plaintiffs' status as pleasure boat owners, rather
4 than a commercial shipowners, did not excuse them from delivering a seaworthy tow to
5 Maritime Logistics. See *Tug Beverly*, 1994 AMC at 2440-41. (Owner of houseboat negligently
6 breached his non-delegable duty to provide a seaworthy vessel, even though he had hired a
7 purported expert to prepare the vessel for towage).

8 **G.      Defendants' damages**

9        **1.      Maritime Logistics's damages are substantial.**

10        As a result of the sinking of the ALBION, Maritime Logistics lost its towing gear. It is
11 entitled to recover the value of that towing gear which was $15,000.

12        Maritime Logistics was required to pay $1,310,295 to the United States government in
13 settlement of the government's strict liability claims under the Oil Pollution Act of 1990, 33
14 U.S.C. § 2701 *et seq.*, the National Marine Sanctuaries Act, 16 U.S.C. § 1431 *et seq.*, and the
15 Comprehensive Environmental Response, Compensation and Liabilities Act, 42 U.S.C. § 9001
16 *et seq.* Maritime Logistics also incurred substantial attorneys' fees in defending against the
17 government's claims and is entitled to recover those fees from plaintiffs as an element of its
18 damages because plaintiffs' sole negligence was the cause of the sinking of the ALBION. See
19 below.

20        **2.      Prejudgment interest**

21        It is well-established that compensatory damages in admiralty cases usually include
22 prejudgment interest. *Western Pacific Fisheries, Inc. v. SS PRESIDENT GRANT*, 730 F.2d
23 1280, 1288 (9th Cir. 1984). In admiralty cases, prejudgment interest is part of the compensation
24 to the injured party, not a penalty. *Columbia Brick Works, Inc. v. Royal Ins. Co. of America*,
25 768 F.2d 1066 (9th Cir. 1985). The awarding of prejudgment interest lies in the discretion of
26 the trial court but the discretion should be exercised with a view that prejudgment interest is an
27 element of compensation and not a penalty. *Western Pacific*, 730 F.2d at 1288.

28

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

3.      **Attorneys fees**

The Standard Towing Agreement signed by plaintiffs and Capt. Loving, on behalf of Marine Logistics, provides with respect to any litigation arising under the Agreement "the substantially prevailing party in any such action shall be entitled to its reasonable attorneys fees." The California Supreme Court has declared this type of clause "may support an award of attorney fees to a prevailing party whether the litigation was based on tort or contract, if it arose [as in our case] out of a relationship originally created by contract." *Carver v. Chevron U.S.A., Inc.*, 97 Cal. App. 4th 132, 149 (2002). Moreover, "where a contract expressly provides for attorneys fees to the prevailing party," the party who obtains a "net monetary recovery is the prevailing party." *J.C. Gury Co. v. Nippon Carbide Industries (USA), Inc.*, 152 Cal. App. 4th 1300, 1306 (2007).

## PLAINTIFF'S CASE AGAINST DEFENDANTS

**H.**     **<u>Under federal maritime law, a tugboat operator's liability is based on negligence</u>**

Although the ALBION was being towed pursuant to a written contract, the US Supreme Court has established plaintiffs' action against Maritime Logistics for the loss of the ALBION sounds in tort, not in contract. Liability is based solely on negligence principles. A towing company is neither an insurer nor bailee of the tow. *Stevens v. The WHITE CITY*, 285 U.S. 195 (1932). See also, *Southgate*, 21 F.2d at 49 (The tug is not the insurer of the safety of the tow, and the happening of an accident---including the loss of the tow---raises no presumption of negligence on the part of the tug.); and *The RADNOR*, 21 F.2d 982, 983 (D. Md. 1927).

The operator of the towing vessel need only "exercise such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings and with such consideration as special circumstances may require." *Shebby Dredging Co. v. Smith Bros., Inc.*, 469 F. Supp. 1279, 1283 (D. Md. 1979), citing and following the rule of *The WHITE CITY*. The tug's master

> "need not exercise the highest degree of care; rather the master is merely obligated to use reasonable and ordinary care and skill, and a court must afford the master great discretion in judging the master's decisions....The master's discretion extends not only to deciding whether to depart from port given certain weather conditions, but also to deciding, once underway, what action, if

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

any, should be taken to protect the tow." *Cargill*, 1991 AMC at 104. See also, *The IMOAN*, 67 F.2d 603, 605 (2d Cir. 1933) and *Fred Smartley*, 100 F.2d at 974.

Before the tug operator's conduct rises to the level of fault, the "error of a master must be gross and flagrant, and a master will be held for lack of seamanship only in case his conduct is outside the range of possible discretion." *Shebby*, 469 F. Supp. at 1283, and cases cited therein. Therefore, the burden of proof remains on the plaintiffs throughout the trial. "Libellant ...has the burden of proof by a fair preponderance of the credible evidence to establish that the loss of the [vessel] was caused by the failure of the [tugboat's] personnel to 'exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.'" *South, Inc. v. Moran Transp. & Towing Co.*, 1965 AMC 2559, 2566 (S.D.N.Y. 1965), *aff'd*, 360 F.2d 1002, 1005 (2d Cir. 1966) and *Stevens v. The WHITE CITY*, 285 U.S. 195 (1932). If the cause of the loss is in the realm of conjecture, the plaintiff has failed to sustain his burden of proof. *The WHITE CITY,* 285 U.S. at 203-204. When the evidence offered by the towed vessel "is consistent with an hypothesis that the tug was not negligent and with one that it was, [it] therefore has no tendency to establish either. *Id.* at 204.

I.  **The Tugboat Operator's on-scene decisions are not be judged in hindsight**

"Substantial discretion" is afforded the master of a tug when he makes navigational decisions during the tow. *Cargill,* 1991 AMC at 106-107. The Second Circuit has cautioned that in determining whether a tugboat operator has acted negligently, the trier of fact should not employ the luxury of hindsight:

> "In faulting the master of a tug for choosing one course of action over others that may have been available in situations requiring judgment under conditions of abnormal stress, we must be careful to judge the conduct of the master of a vessel in the light of the circumstances which he faced at that time ... and not as they may have appeared to one looking back at them several hours or days later"

*Esso Standard Oil, S.A. vs. S.S. Gasbras Sul*, 387 F.2d 573, 582 (2d Cir., 1968).

See also, *In re Seaboard Shipping Corp.* 1971 AMC 242 (S.D.N.Y. 1970).

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

The towing company is not liable because the tug captain did not do precisely what, after the event, others may think would have been the best. *M.P. Howlett v. Tug Michael Moran* 1970 AMC 783, 787 (2d Cir. 1970).

Furthermore, the towing tug does not have the burden of proving its fault did not cause the casualty. *South Inc. v. Moran Transp. & Towing Co* 1965 AMC 2559, (S.D.N.Y. 1965), *aff'd*, 360 F.2d 1002, 1005 (2d Cir 1966). "The burden [is] not on the tug to prove how the accident happened." *New Orleans Coal & Bisso Towboat Co. v. United States*, 86 F.2d 53, 61 (5th Cir. 1936).

**J.** **Maritime Logistics did not have duty to make the ALBION seaworthy, or to install or provide equipment on her to insure her seaworthiness**

Plaintiffs apparently do not challenge the navigation of the Tug MICHAEL UHL, or the way the ALBION's towing equipment was configured or installed. Instead, they argue Maritime Logistics was obligated to perform certain duties, which by law are their responsibility. For example, plaintiffs contend defendants were somehow required to purchase and install alarms or strobe lights on the ALBION, as part of defendant's towing responsibilities. They are wrong. Their theory turns the well-established law of seaworthiness on its head. As the Court explained in *McDermott*: "It is not the duty of the tug to make the tow and her cargo seaworthy, it is the direct duty of the owner of the tow." 1997 AMC at 701. The duty to provide proper equipment for the vessel, or navigational aids rests solely on the tow owner, and the warranty of seaworthiness exists for the benefit of the tower. Benedict, supra, at 14.04[2]. See also the Eighth Circuit's recitation of a tow owner's duties in *Arkansas State Highway Comm'n v. Arkansas River Co.*, 271 F.3d 753, 760 (8th Cir. 2001)[The tow owner must not only tender a structurally sound vessel, but must also prepare the vessel's equipment and appurtenances "in such a way that the tug operator will be able to successfully negotiate the conditions and obstacles that the tow will encounter."]; Judge Learned Hand's opinion in *The T.J. HOOPER*, 60 F.2d 737 (2d Cir. 1932), in which he explained it was the tow owner's responsibility to provide his vessel with working pumps, and his failure to do so made his vessel unseaworthy; and *American Home Assurance v. L & L Marine Inc.*, 688 F. Supp. 502 (E.D. Mo.

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  1988), *aff'd in pertinent part*, 875 F.2d 1351 (8th Cir. 1989)[tow's obligation to provide

2  properly working winches and shipboard equipment].

3        Even if defendants were obligated in some way to provide a means of ascertaining

4  whether the ALBION was beginning to take on water (which is not the case), they were not

5  obligated to purchase the most sophisticated equipment for this job.  The law of seaworthiness

6  does not require the best, newest or most sophisticated equipment.  All that is required is

7  equipment which is reasonably fit for its intended purpose.[14]  *Gainar v. S.S. LONGVIEW*

8  *VICTORY*, 226 F. Supp. 912, 915 (E.D. Va. 1964).  See also, *Stevens v. East-West Towing Co.*

9  649 F.2d 1104, 1107-1108 (5th Cir. 1981).  Defendants made sure they could see the vessel they

10  were towing by means of bright spotlights and "feel" the tow by means of the properly installed

11  towing gear.  More was not required by law or industry custom.  Maritime Logistics had no

12  greater duty toward the ALBION than plaintiffs had and no case imposes such duty on a towing

13  vessel.  Indeed, Maritime Logistics's duty was limited to a cursory inspection of the ALBION

14  because it could rely on the warranty of seaworthiness imposed on plaintiffs.

15  **K.     Maritime Logistics was entitled to assume the ALBION was tendered in a**
         **seaworthy condition and could further rely on plaintiffs' representations regarding**
16       **the ALBION's good condition.**

17        "Because a tug does not serve to insure its tow or to act as bailee of its tow, it is entitled

18  to rely on the presumption that the tow is seaworthy." *Cargill*, 1991 AMC at 107.  See also,

19  Kenny Marine, 583 F. Supp. at 1198.  This presumption is rendered almost unassailable when

20  the tow's owner makes representations about the seaworthiness or good condition of his vessel.

21  See *Marina Mgmt. Group, Inc. v. Basic Towing, Inc.*, 2003 U.S. App. LEXIS 10863 (6th Cir.

22  2003)[A tow owner's assurances of a vessel's seaworthiness in response to specific inquiries by

23  the tug eliminate the need for a detailed in-depth inspection.]; *Star Towing Co. v. Barge ORG-*

24  *6504*, 301 F. Supp. 819 (E.D. La. 1969)["Indeed, the tug master is entitled to rely upon the

25  owner's warranty of seaworthiness unless it is apparent to him that the vessel is

26  unseaworthy...."].

27  _____

[14] Note, however, that in this instance it was the duty of the ALBION's owners to provide the
28  equipment necessary to make their vessel reasonably fit for the ocean tow from San Diego to
   Oregon.

**L. Because of Plaintiffs' duty to tender a seaworthy vessel, Maritime Logistics had no obligation to do more than a cursory inspection of the ALBION.**

A tugboat operator has no duty to: 1) make a detailed inspection of an apparently seaworthy tow, *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 94 (5th Cir. 1975), modified in part for other reasons at 520 F.2d 1104 (5th Cir. 1975); or 2) give the towed vessel more than a "cursory" inspection before undertaking the voyage. *Cargill*, 1991 AMC at 108. See also, *In re Christiansen Marine, Inc.*, 1966 AMC 2353, 2363-2364 (E.D. Va. 1996)[tug's only duty is to "perform a cursory inspection of her tow."].

A detailed inspection of an apparently seaworthy tow is not required. *Dow Chemical Co. v. M/V GULF SEAS*, 428 F. Supp. 667, 671 (W.D. La. 1977). A short "walk around inspection" by the tugboat operator is all that is legally required. *Christiansen Marine*, 1966 AMC at 2360. See also, *Theriot v. Dawson Production Services, Inc.*, 1998 U.S. Dist. LEXIS 14932 (E.D. La. 1998)[A tug operator has no duty to "painstakingly search out potential hazards" on its tow]; *Complaint of Steuart Transp. Co.*, 435 F. Supp. 798, 804 (E.D. Va.1977), *aff'd*, 596 F.2d 609 (4th Cir. 1979)[It would not be "reasonable for the captain to inspect the barge in every detail for seaworthiness. He is entitled to rely on the expectation that he has been furnished a sound vessel...."].

More pertinently, even if the tugboat operator inspects the tow, this "does not supersede the absolute duty of the tow to provide a seaworthy vessel." *Cargill*, 1991 AMC at 108. See also, *Schuylkill Transp. Co. v. Banks*, 152 F.2d 405, 407 (3d Cir. 1945).

**M. Maritime Logistics had no duty to constantly monitor the ALBION.**

Plaintiffs' experts opine – once again, incorrectly – the tugboat's crew was required to keep watch on the ALBION non-stop. Capt. Stewart declared the crew should have monitored the tow "24/7", never letting it out of their sight.[15] This is not the law, however. When, as here, the weather was fair and the seas were calm, the tug must only "maintain some reasonably close observation of its tow; the law does not require constant surveillance absent some reason to

---

[15] Capt. Stewart admitted, however, he was unaware of any book, publication or law that requires this type of constant monitoring of a tow by a tug. [Dep of Robert Stewart, p 73 1. 25 to p. 74 1. 9.]

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1 anticipate disaster." 8 Benedict on Admiralty (7th ed. Rev.) sec. 14.05[5]. See also, *Massman*

2 *Const.*, 462 F. Supp. at 1368 (Tug has no duty to post a lookout, or maintain constant

3 surveillance of tow); *Moran Transp.*, 1965 AMC at 2567, *aff'd*, 360 F2d at 1005; *A.S.*

4 *Wikstrom, Inc. v. THE TUG JULIA C. MORAN*, 190 F. Supp. 250, 252 (S.D.N.Y. 1960)["In the

5 absence of any reason to expect a perilous condition to develop, constant surveillance of the tow

6 is not mandated."]

7 **N.** **Recoverable damages**

8 **1.** **Plaintiffs cannot recover more than the market value of the ALBION**
      **immediately before she sank.**

9

10 Even if plaintiffs establish Maritime Logistics or its employees were negligent, they are

11 entitled to recover only the value of the ALBION at the time of the sinking, not the anticipated

12 value after refurbishment. When a vessel is a total loss as the result of a casualty, the measure

13 of damages to be applied is the "market value" at the time of destruction. *Standard Oil Co. of*

14 *New Jersey v. Southern Pac. Co.*, 268 U.S. 146, 155-156 (1925). The U.S. Supreme Court

15 explained that market value is "established by the contemporaneous sales of like property in the

16 way of ordinary business." *Id.*

17 It is plaintiffs' burden, of course, to prove their damages by means of presenting the trier

18 of fact with evidence of generally contemporaneous sales of similar vessels. *Tidewater Marine,*

19 *Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987 (E.D. La. 2000). That value is not established

20 merely by the amount of insurance on the ALBION.[16]

21 The physical evidence will establish the ALBION had, at best, minimal, if not negative

22 value because of her extensively rotten condition (that plaintiffs attempted to disguise with latex

23 house paint), her lack of any interior accommodations, and her obsolete engines. It is not mere

24 coincidence plaintiffs' "expert" Sharpe valued the ALBION at her insured value after the fact

25 and without ever seeing her. He found evidence of a sale of a similar, but not comparable,

26 vessel for $270,000 and deducted $100,000 for the lack of accommodation on the ALBION.

27 Such valuation method does not provide a sound basis for valuation of the distressed ALBION.

28

---

[16] The insurance was placed on the ALBION without a condition and valuation survey.

2. **Plaintiffs cannot recover for their alleged emotional distress.**

Plaintiffs are not entitled to recover for their alleged emotional distress from the loss of the ALBION. The federal courts have recognized when the alleged tort results only in economic injury to the plaintiff, there is no right to recover for emotional distress. *Averbach v. Vnescheconombank*, 280 F. Supp. 2d 945, 960 (N.D. Cal. 2003); *Patel v. United States*, 806 F. Supp. 873, 879 (N.D. Cal. 1992). California courts recognize the same rule. See *Erlich v. Menezes*, 21 Cal. 4th 543, 554-555 (1999).

3. **Plaintiffs are not entitled to recover for the loss of use of the ALBION.**

Plaintiffs are also not entitled to recover for the loss of use of the ALBION. As a matter of federal law, loss of use damages are not recoverable for the loss of use of a private pleasure craft. *Oppen v. Aetna Ins. Co.*, 485 F.2d 252 (9th Cir. 1973); *Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245 (7th Cir. 1996).

4. **The principles of comparative fault apply to reduce any award in plaintiffs' favor.**

Even if there were negligence by Maritime Logistics, which is absolutely denied, any recovery by plaintiffs must be reduced by the percentage of fault attributed to plaintiffs. Federal maritime law recognizes the doctrine of comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975).

## III. CONCLUSION

As a matter of law, plaintiffs had a non-delegable duty to tender the ALBION to Maritime Logistics for towing in a seaworthy condition. And, as a matter of law, they warranted the seaworthy condition of the ALBION. The ALBION was not seaworthy when tendered for towing. To the contrary, she was extensively rotted and had been negligently repaired which conditions led to her sinking.

Defendants had no duty to inspect the ALBION in any detail or take steps to make her seaworthy. They had no duty to install equipment on the ALBION or commission a survey. Instead, they were entitled to rely on the warranty of seaworthiness owed by plaintiffs and the representations made by them as to her seaworthiness.

-- 22 --

1  During the tow, defendants had a duty only to exercise such reasonable care, and
2  maritime skill prudent navigators employ under similar circumstances. They had no duty to
3  constantly monitor the tow, particularly when no adverse weather or sea conditions were
4  expected. Defendants' conduct during the tow is not to be measured by hindsight. Defendants
5  were not negligent in towing the ALBION and were not cited for negligence by the
6  governmental authorities having the power to do so.

7  Maritime Logistics suffered substantial damages as a result of plaintiffs' negligence and
8  the unseaworthiness of the ALBION and are entitled to indemnity from plaintiffs. Maritime
9  Logistics is entitled to be reimbursed for 1) the amount paid to the United States in settlement of
10  the government's statutory claims and 2) the value of its lost towing gear. It is also entitled to
11  recover prejudgment interest and attorneys fees pursuant to the towing agreement.

12  Even if Maritime Logistics were at fault, which is denied, plaintiffs' recovery is limited
13  to the market value of the ALBION at the time of the sinking which was negligible. They are
14  not entitled to recover for emotional distress or loss of use of the ALBION. Further, any award
15  they might obtain is subject to reduction by their percentage of fault, which is substantial given
16  the very poor condition of the ALBION.

17  DATED:  March 27, 2009

18

19                                          BULLIVANT HOUSER BAILEY PC

20                                          By _____
21                                              Marilyn Raia
                                               Norman J. Ronneberg, Jr.
22
                                            Attorneys for Tug Michael Uhl, Her Engines,
23                                          Machinery, Tackle, Equipment, Furnishings and
                                            Appurtenances, in Rem, and Maritime Logistics, Inc.,
24                                          Frank Loving, an Individual and Blaine Hughes, an
                                            Individual in Personam
25  11298300.1
26

27

28

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# CERTIFICATE OF SERVICE

*Alan Carpenter, et al. vs. Tug MICHAEL UHL, et al.*
U.S. District Court, Southern District of California, Case No.: 07 CV 0166 DMS POR

    I hereby certify that on March 30, 2009, a copy of the foregoing **DEFENDANTS'**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW** was filed electronically.
Notice of this filing will be sent to the following parties by operation of the Court's electronic
filing system. Parties may access this filing through the Court's system:

Alan Nakazawa
Cogswell Nakazawa & Chang, LLP
alan.nakazawa@cnc-law.com

Robert Wolfe
Engstrom, Lipscomb & Lack
bwolfe@elllaw.com

    I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

_____
Cristina Bonnevie

6092414.1

– 1 –