1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ALAN CARPENTER AND TRACY                CASE NO. 07cv0166 DMS (POR)
     RAGSDALE, individuals,
12                                           **FINDINGS OF FACT AND**
                             Plaintiffs,     **CONCLUSIONS OF LAW**
13         vs.

14   Tug MICHAEL UHL, her engines,
     machinery, tackle, equipment, furnishings
15   and appurtenances, *in rem*, and MARITIME
     LOGISTICS, INC., FRANK LOVING, and
16   individual, and BLAINE HUGHES, an
     individual *in personam*,
17
                             Defendants.
18

19         Plaintiffs Alan Carpenter and Tracy Ragsdale filed their Complaint in this case on January 26,

20   2007.  Defendants are the Tug Michael Uhl, Maritime Logistics, Inc., Frank Loving and Blaine

21   Hughes.  The First Amended Complaint, filed on January 30, 2008, alleges the following claims: (1)

22   maritime tort against all Defendants, (2) breach of contract against Defendants Maritime Logistics

23   Frank Loving, (3) breach of warranty against Maritime Logistics and Frank Loving, (4)

24   indemnity/negligence against all Defendants, (5) indemnity/breach of contract against Maritime

25   Logistics and Frank Loving, (6) contribution against all Defendants, (7) declaratory relief, (8)

26   contribution under the Comprehensive Environmental Response, Compensation and Liability Act

27   ("CERCLA"), and (9) contribution under the Oil Pollution Act of 1990 ("OPA").  Plaintiffs seek a

28   judgment *in rem* against the Michael Uhl, damages, costs, expenses, attorneys' fees and interest.

                                            - 1 -                                07cv0166

1    Defendants filed an Answer and Counterclaim on February 20, 2008. The Counterclaim

2   alleges the following claims: (1) breach of contract, (2) fraud, (3) negligence, (4) negligent

3   misrepresentation, (5) tort of another, (6) implied indemnity, and (7) contribution. Defendants seek

4   judgment in their favor, costs, and attorneys' fees.

5           The case came on regularly for a bench trial on April 29, 2009. Robert Wolfe and Alan

6   Nakazawa appeared on behalf of Plaintiffs, and Marilyn Raia and Norman Ronneberg appeared on

7   behalf of Defendants.

**I.**

**FINDINGS OF FACT**

10   1.      Plaintiffs Alan Carpenter and Tracy Ragsdale are the former owners of a 62-foot Defever

11   Trawler named "Albion."

12   2.      The Albion was formerly named "Viking." It was towed into the Nielsen-Beaumont Boatyard

13   on Shelter Island in San Diego, California, after taking on water. (Rep.'s Tr., Trial Test. of Phillip

14   Dupre ("Dupre Test.") at 19.)

15   3.      After arriving at the boatyard, the Viking was sanitized, and the water was removed. (*Id.* at

16   19-20.) The Viking was thereafter offered for sale by Nielsen-Beaumont.

17   4.      Plaintiff Alan Carpenter was looking to purchase a Defever boat, and saw the listing for the

18   Viking. (Rep.'s Tr., Bench Trial/Day One at 6.) At the time, Plaintiffs owned two other boats, a 1965

19   35-foot Spencer sailboat, and a 20-foot Pacific Seacraft Flicka. (Id. at 71.)

20   5.      Mr. Carpenter inspected the Viking, and found that it was outfitted with Decca Radar, a

21   satellite weather fax system, a shortwave marine radio, a hailer loudspeaker, and a radio and lights,

22   all of which were operational. (*Id.* at 10-11.) The interior was filled with mahogany paneling,

23   furniture and fixtures. (*Id.* at 11.) It had a fo'c'sle, a main stateroom and a main salon. (*Id.* at 19, 26.)

24   The hull was made of Honduras mahogany, and was constructed using the bead and cove method. (*Id.*

25   at 32, 41.)

26   6.      Mr. Carpenter knew that certain things in the boat would have to replaced, including the

27   engines and wood strips on the starboard log. (*Id.* at 9.) However, he was looking for a "good hull,"

28   (*id.* at 6), and was interested in restoring the boat to its original condition. (*Id.* at 11.)

7.      Mr. Carpenter asked Phillip Dupre, a shipwright and former employee of Nielsen-Beaumont, (Dupre Test. at 4, 20), to look over the vessel.  Mr. Dupre "thought it was stout.  I thought it was a good, stout, solid vessel."  (*Id.* at 21.)

8.      In May 2000, Mr. Carpenter and Ms. Ragsdale purchased the Viking for $42,000, $20,000 of which was the cost of the vessel.  The remainder of the purchase price was towage and storing charges.  (Rep.'s Tr., Trial Test. of Alan Carpenter/Day Two ("Carpenter Test.") at 287.)

9.      After purchase, Plaintiffs renamed the boat "Albion," and docked her at the Nielsen-Beaumont shipyard.  (Rep.'s Tr., Bench Trial/Day One at 14-15.)

10.     The Albion was subsequently pulled out of the water and inspected.  (*Id.* at 31.)  At that time, Mr. Carpenter noticed a leak in the bolts on the port log, and epoxy was applied "as an immediate stop[.]"  (*Id.* at 75.)

11.     Mr. Dupre replaced the strips on the starboard log that Mr. Carpenter noticed during his initial inspection of the boat.  (*Id.* at 61.)  The starboard log was also removed, resealed and refitted, and the shaft was reinstalled in the log.  (*Id.* at 60, 62.)

12.     Plaintiffs purchased and installed two rebuilt engines and transmissions in the Albion.  (*Id.* at 15-17.)  The cost of the engines and transmissions was $17,000.  (*Id.* at 30.)  Mr. Carpenter also rebuilt the motor in the windlass and put brushes in it, (*id.* at 25), and replaced the wiring in the boat.  (*Id.* at 43.)  In addition, "the drivelines, rudders, propellers were all removed from the boat and were gone through.  The drive shafts were straightened by Nielsen Beaumont, and all of the packing glands, which are basically the seals to stop the sea water from coming back in into the hull, were all replaced with new packing glands.  And everything was refitted."  (*Id.*)  Mr. Carpenter also sistered some ribs that had "minor heat fractures in them[.]"  (*Id.* at 68.)

13.     In December 2004, Nielsen-Beaumont pulled the Albion out of the water.  (*Id.* at 73; Pls.' Ex. 24.)  Nielsen-Beaumont staff cleaned the hull using a high-pressure wash.  (Rep.'s Tr., Bench Trial/Day One at 74-75.)  They also removed the log from the port side, cleaned it, inspected the bolts and the planking, removed a rubber gasket that had been placed between the log and the hull, opened the holes on the hull, and replaced the log with new bolts and sealant.  (*Id.* at 76.)  After that work was

/ / /

07cv0166

completed, the bottom of the boat was inspected and repainted. (*Id.* at 77.) It was then put back in the water. (*Id.* at 78.)

14.     Shortly after the new year, Mr. Carpenter took the Albion out into San Diego Bay for about four hours. (*Id.*) He inspected the Albion after that trip, and "[i]t checked out just fine." (*Id.* at 79.)

15.     Soon after that trip, Mr. Carpenter contacted Defendant Frank Loving to discuss the possibility of Mr. Loving towing the Albion from San Diego to Winchester Harbor in Oregon. (*Id.* at 110-12.) Mr. Loving is the President of Defendant Maritime Logistics, Inc., which is the owner of the Defendant Tug Michael Uhl ("the tug"). (Pls.' Ex. 8.)

16.     The two men discussed the Albion, and Mr. Loving told Mr. Carpenter he would have to perform several tasks to prepare the Albion for tow, which he did. (*Id.* at 113.) Mr. Carpenter also installed two extra bilge pumps in the bilge, along with a generator to run the pumps, if necessary. (*Id.* at 127-28.)

17.     The men also discussed "dogging," or locking, the drive shafts of the Albion. (*Id.* at 115-18.) The purpose of "dogging" the shafts is to prevent damage to the transmission, (*see id.* at 117-18; Rep.'s Tr., Trial Test. of Stephen Ruttschow ("Ruttschow Test.") at 14), and to prevent the shaft from pulling out of the transmission and causing a leak into the vessel. (Rep.'s Tr., Trial Testimony of Robert Stewart ("Stewart Test.") at 25.) At the end of that conversation, Mr. Carpenter understood that Mr. Loving would "dog" the shafts with chain locks. (*Id.* at 125.)

18.     Maritime Logistics generally "dogged" shafts with chain locks. (Ruttschow Test. at 80-81; Rep.'s Tr., Trial Test. of Frank Loving ("Loving Test.") at 5.) Mr. Loving, however, had "never personally made a shaft dog." (Loving Test. at 5.)

19.     Mr. Carpenter did not "dog" the shafts because the Albion had to be motored from the Nielsen-Beaumont shipyard to Mr. Loving's tug. (Rep.'s Tr., Bench Trial/Day One at 124-25.)

20.     On January 20, 2005, the day before the tow started, Mr. Carpenter took the Albion out for sea trials and fueling. (Id. at 129.) Two of Mr. Loving's employees, Stephen Ruttschow and Lance Leage, were also on board, as well as a friend of Mr. Carpenter's, Don Schwartz. (*Id.* at 130.) Mr. Ruttschow motored the Albion that day, first to Pearson's Fuel Dock. (*Id.* at 130, 133.) After fueling, the Albion had a slight list to the port side because the fuel had not leveled off. (*Id.* at 137.)

Therefore, they "did a series of high speed donuts in the bay in an attempt to move the fuel over to the other side." (*Id.*) Mr. Carpenter estimates they were out on the Bay "for an hour and a half, maybe two hours, playing around." (*Id.*)

21.     Despite the donuts, the Albion was still listing when they returned to the dock. (*Id.* at 139.) Mr. Loving told Mr. Carpenter he would not tow the boat if it had a list, therefore Mr. Carpenter ran a balance hose across the fuel tanks. (*Id.* at 140.)

22.     The next morning, the Albion was stable. (*Id.* at 142.) Mr. Carpenter and Ms. Ragsdale met Mr. Loving, Mr. Ruttschow and Mr. Leage on board the Albion. (Rep.'s Tr., Trial Test. of Tracy Ragsdale ("Ragsdale Test.") at 8.) Mr. Loving, Mr. Ruttschow and Mr. Leage began to prepare the Albion for tow. (Rep.'s Tr., Bench Trial/Day One at 142-43.) Mr. Ruttschow installed the towing bridle and the towing gear per Mr. Loving's instructions. (Ruttschow Test. at 13.)

23.     Prior to towing the Albion, and while working for Maritime Logistics, Mr. Ruttschow had participated in two other vessel tows. (*Id.* at 37-38.) The first was six years prior to the tow of the Albion, and involved the tow of two tug boats from Morro Bay to San Diego. (*Id.* at 37.) The other involved the tow of a 38-foot sailboat seventeen miles from Morro Bay to Port San Luis. (*Id.* at 38.)

24.     Mr. Carpenter and Ms. Ragsdale told Mr. Loving and Mr. Ruttschow that they had installed an emergency pumping system on the Albion, and told them how to operate it. (Ragsdale Test. at 8.) Mr. Carpenter, Ms. Ragsdale and Mr. Loving also discussed "dogging" the shafts. (*Id.* at 9.) At some point during that discussion, they "were interrupted by Lance Leage, who came up with a sliver of metal and asked Frank what to do with this. And Frank said to go ahead and drill a hole in it." (*Id.* at 9-10; *see also* Carpenter Test. at 287.) At the time, Mr. Carpenter and Ms. Ragsdale "had no idea" what the bar was for. (Ragsdale Test. at 10; Carpenter Test. at 287.) After the sinking, however, Mr. Carpenter saw a similar material on the transmission on the starboard side of the Albion remains, (Carpenter Test. at 287), and Ms. Ragsdale saw pictures of the bar that indicated it was used as "[t]he locking mechanism for the drive shafts." (Ragsdale Test. at 10.)

25.     After that discussion, Mr. Carpenter and Ms. Ragsdale left the Albion. (*Id.*)

26.     After making all of the tow gear, Mr. Ruttschow motored the Albion back to Pearson's Fuel Dock so it could be made up to the tug. (Ruttschow Test. at 46.) Mr. Ruttschow was the last person

to operate the Albion before the towline was affixed to the Albion and the tow got underway. (*Id.* at 47.)

27.      Although Mr. Ruttschow received orders "on how to dog the shafts," he did not personally "dog" the shafts. (*Id.* at 51.) He thought "one of my two deckhands [i.e., Mr. Leage or Barry Lambert] would have done it." (*Id.*)

28.      Barry Lambert, a friend of Mr. Loving's and an employee of Maritime Logistics, joined the tug crew in San Diego. (*See* Pls.' Designation of the Deposition Testimony of Barry Lambert, Ex. A at 51.) This was the first time Mr. Lambert had towed another boat as an employee of Maritime Logistics. (*See id.* at 38.) Mr. Carpenter and Ms. Ragsdale never met Mr. Lambert.

29.      Before the tug departed, Mr. Lambert walked through the Albion and saw "[s]ome kind of a piece of bar or something" on the shafts. (*Id.* at 80.) He did not put the bar on the shafts. (*Id.*) In fact, he had never "dogged" a shaft, never received any training on how to "dog" a shaft, and only saw it done once before towing the Albion. (*Id.* at 80-81.)

30.      Mr. Carpenter and Ms. Ragsdale met with Mr. Loving later in the day onboard the tug, "and, at that point in time, there was another discussion about using chain locks to lock the drive shaft." (Ragsdale Test. at 10.)

31.      That same day, Mr. Carpenter and Ms. Ragsdale signed a Standard Towage Agreement with Maritime Logistics. (*See* Pls.' Ex. 1.) The total cost of the job was $36,000. (*See id.*) Plaintiffs paid half of that amount prior to the tow, with the balance due upon delivery of the tow in Oregon. (Ragsdale Test. at 11.)

32.      The tug departed San Diego late that evening. (*See* Pls.' Ex. 86.) Mr. Loving, Mr. Ruttschow, Mr. Leage and another employee of Maritime Logistics, Barry Lambert, were onboard the tug. No one was aboard the Albion.

33.      The voyage from San Diego to Morro Bay was uneventful. (Ruttschow Test. at 19-20.) The weather during the voyage was "perfect." (*Id.*) "Fair weather and very calm seas." (*Id.*)

34.      On January 23, 2005, the tug arrived in Morro Bay. Upon entering into Morro Bay, the tug crew shortened the tow line, and put the Albion "on the hip" of the tug. (*Id.* at 20.) The two vessels then proceeded to the tug's dock space, where they remained for the next several days. (*Id.*)

35.     Mr. Ruttschow inspected the Albion every day while the vessels were docked in Morro Bay. (*Id.* at 21.)

36.     Before arriving in Morro Bay, Mr. Loving contacted his friend and employee, Blaine Hughes, to inquire about his availability to assume command of the tug in Morro Bay.  Mr. Hughes was available, and he relieved Mr. Loving in Morro Bay.  Before turning the tug over to Mr. Hughes, Mr. Loving failed to tell him there was fuel on board the Albion.  (Rep.'s Tr., Bench Trial/Day Two at 87.)

37.     Mr. Loving called Mr. Carpenter to let him know they had arrived in Morro Bay, and that "everything was doing fine."  (Rep.'s Tr., Bench Trial/Day One at 152.)  However, Mr. Loving failed to tell Mr. Carpenter that he would not be continuing on to Oregon, and that Mr. Hughes would be assuming command of the tug operation.  (*Id.* at 153.)  Mr. Carpenter and Ms. Ragsdale had not met Mr. Hughes before he assumed command of the tug operation.

38.     On January 29, 2005, the day before the tug left Morro Bay, Mr. Hughes did a cursory walk-through of the Albion.  (Rep.'s Tr., Bench Trial/Day Two at 16.)  In his words, "I inspected the hard points where the bridle was attached.  In this case it was a wooden vessel, which I went interior, pulled up an engine room hatch, looked down there to see if there was any water in the bilge.  And that was about it."  (*Id.*)  The walk-through took "maybe 15 or 20 minutes."  (*Id.*)

39.     During the walk-through, Mr. Hughes noticed a "normal amount" of water in the bilge.  (*Id.* at 20.)

40.     He understood that the shafts of the Albion had been "dogged," but he did not know how the shafts were "dogged."  (*Id.* at 26.)  In his words, "It wasn't my concern if the shafts were dogged or not."  (*Id.* at 92.)  According to Mr. Hughes, "my responsibility is from the tow wire to the bridle[.]"  (*Id.* at 22.)

41.     The tug left Morro Bay on the morning of January 30, 2005.  (*Id.* at 13.)  The crew was the same, save for Mr. Hughes at the command.  The shifts were divided into six-hour increments starting from midnight to 6:00 a.m., 6:00 a.m. to 12:00 noon, and so forth.  Mr. Hughes and Mr. Lambert were on watch for the 6:00 shifts, and Mr. Ruttschow and Mr. Leage were on watch for the other two shifts.  (*Id.* at 28.)

/ / /

07cv0166

42.     The voyage out of Morro Bay and up the coast was "ideal.  It was flat, calm.  Fair weather.  It was a beautiful day." (*Id.* at 31.)  The tow line was extended to between 1200 and 1300 feet to keep the tow "in step" with the tug and to have a proper catenary.  (*Id.* at 39.)

43.     During his 6:00 p.m. shift, Mr. Hughes laid down in the wheelhouse while Mr. Lambert was on wheel watch.  (See Pls.' Designation of the Deposition Testimony of Barry Lambert, Ex. A at 131.)

44.     At approximately 8:00 p.m., however, Mr. Hughes noticed a problem with the Albion.  (Rep.'s Tr., Bench Trial/Day Two at 27.)  At that time, Mr. Hughes was in the wheelhouse with Mr. Lambert when he noticed the red and green lights on the sides of the Albion appear and disappear, and the boat "started yawing back and forth, whipping back and forth, and tracking one side, and coming back to the other." (*Id.* at 38.)  Mr. Hughes shined a light on the Albion, and saw "it was down on the bow, and we were – the boat was in trouble." (*Id.*)  He "immediately sounded the general alarm, slowed the vessel down.  Shortened the tow, tried to gain control of the tow.  And tried to assess the magnitude of our problem." (*Id.* at 50.)  It took the crew about 15 to 20 minutes to shorten the tow "to a point where we were in a position to – to possibly intervene," but by that time "the deck was awash." (*Id.* at 50, 53.)  It stayed that way "for the next 45 minutes ....  There was no deterioration and no – sinking no further." (*Id.* at 57.)

45.     After the crew had gained control of the situation, Mr. Hughes called the Coast Guard to apprise them of the situation.  (*Id.* at 53-54.)  They came up with a plan to bring the tow "into Monterey Harbor where they had facilities to get ahold of her and salvage her." (*Id.* at 61.)

46.     At that time, "[t]he bulwarks around the wheelhouse, and the bulwarks or small little railing that was up in the bow, the wheelhouse, super structure, the mast," were all above water.  (*Id.* at 62-63; see also Defs.' Ex. MM.)  The Albion remained in that position until the next morning, when it lost its fly bridge.  (Rep.'s Tr., Bench Trial/Day Two at 65.)

47.     As the tug was approaching Monterey breakwater with the Albion still in tow, the crew was confronted by National Marine Sanctuary Police.  (*Id.* at 69.)  The police ordered Mr. Hughes to stop, but he initially refused because he knew "once we had stopped we would lose our momentum, then the tow would probably settle on the bottom." (*Id.* at 70.)  After further orders and "provocative mannerisms" from the police, Mr. Hughes stopped the tug.  (*Id.* at 71.)  After the tug stopped, the

Albion caught up to the tug, and the crew "spilled the towline to where we were certain that the boat – the boat was on the bottom." (*Id.* at 72.)

48. After the initial incident, Mr. Hughes called Mr. Loving to tell him that the Albion had begun taking on water. (Rep.'s Tr., Trial Test. of Frank Loving ("Loving Test.") at 12.) Mr. Loving thereafter called Mr. Carpenter to tell him that the Albion had gone bow down. (Rep.'s Tr., Bench Trial/Day One at 155.) At that time, Mr. Loving did not tell Mr. Carpenter he was not on board the tug. (*Id.* at 159.) Mr. Carpenter learned that fact when he spoke with Mr. Loving the next morning. (*Id.* at 159-60.)

49. After learning that the tug was on its way to Monterey, Mr. Carpenter contacted Vessel Assist in Monterey to attempt to salvage the Albion. (*Id.* at 162.)

50. Chelsea Wagner at Vessel Assist later informed Mr. Carpenter that the Albion had sunk to the bottom, and that it was in a maritime sanctuary. (*Id.* at 163.)

51. Mr. Carpenter informed Ms. Wagner that there was fuel on board, and she arranged for the fuel vents to be sealed. (*Id.* at 164.) Specifically, Ms. Wagner arranged for Phillip Sammet, a professional diver, to secure the fuel cell. (*Id.* at 83-84.)

52. Mr. Sammet dove the Albion on the evening of January 31, 2005, and he sealed the fuel vents with epoxy. (*Id.* at 84-85.)

53. Ms. Wagner also arranged to raise the Albion off the ocean floor with lift bags. (*Id.* at 90.) In connection with this effort, Mr. Wagner had Mr. Sammet and another diver, "Wings" Stocks, attach chains to the Albion and install large lift bags above the boat in the hope that once the bags were inflated, they would raise the Albion off the seabed. (*Id.*) The bags were inflated, but they were unable to raise the Albion. Instead, "what was up was just the bulwarks and the cleats and the actual structure of the upper structure of the hull." (Ruttschow Test. at 35.)

54. After this attempt to raise the Albion failed, Mr. Stocks dove the Albion again and recorded a video of the Albion on the sea floor. (Rep.'s Tr., Trial Test. of Thomas Dane (Wings) Stocks ("Stocks Test.") at 8; *see also* Pls.' Ex. 62.) The purpose of the video was "to document the work [he] had done on the wreck. ... because I hadn't been paid on one job, four or five years before, and I wanted to document what Phil and I had done on the boat." (Stocks Test. at 8.) The video depicts the

Albion resting on its bottom with the port side down. It also reveals a four- to six-foot hole in the bottom of the vessel forward of the starboard shaft log. (Rep.'s Tr., Trial Testimony of Randell Sharpe/Day Two ("Sharpe Test. Day Two") at 13.)

55. Mr. Stocks recorded another video of the Albion in November 2005 out of "curiosity," and because he was "considering putting in an application to lift it." (*Id.* at 33.)

56. On August 15, 2006, the United States, by and through its representatives and/or response contractors, successfully removed portions of the Albion from the sea floor. (Pls.' Ex. 8 at 6.) Those remains were put on a barge in Monterey Bay. (Carpenter Test. at 263.) From there, the remains were taken to the San Francisco Bay area and dumped into two containers. (*Id.* at 266.) The containers were then taken by truck to Filters Recycling in the Los Angeles area. (*Id.*)

57. At Filters, the remains were sorted and subjected to a high pressure wash. (*Id.* at 272.) Mr. Carpenter and Mr. Dupre examined the remains and took photographs. (*Id.*) During that visit, Mr. Carpenter observed the remains being loaded into a container with a skip loader and a front loader. (*Id.* at 273.) Mr. Carpenter observed the remains being unloaded and reloaded during a second visit to Filters, and also saw the remains being loaded for transport to Evidence Secure Storage. (*Id.*)

58. At Evidence Secure Storage, Mr. Carpenter observed the remains being removed from the container with a forklift. (*Id.*)

59. In 2007, the United States of America brought an action against Plaintiffs and Defendants to recover its response costs and damages under the OPA, the National Marine Sanctuaries Act, and CERCLA, arising out of the recovery of the Albion. (Pls.' Ex. 8.) The parties entered into a consent decree pursuant to which Mr. Carpenter, Ms. Ragsdale and Maritime Logistics agreed to pay the United States $1,600,000 as settlement of the government's claims. (*Id.*) Mr. Carpenter and Ms. Ragsdale through their insurer, paid $287,704.74, and Maritime Logistics, through its insurer, paid $1,313,295.25.

## II.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333.

/ / /

2.     In admiralty cases such as this one, "'federal maritime law applies where it exists.'" *Becker v. Poling Transportation Corp.*, 356 F.3d 381, 388 (2d Cir. 2004) (quoting *Mentor Ins. Co. (U.K.) Ltd. v. Bannkasse*, 996 F.2d 506, 513 (2d Cir. 1993)).

3.     As stated above, Plaintiffs allege nine claims for relief:  (1) maritime tort, (2) breach of contract, (3) breach of warranty, (4) indemnity/negligence, (5) indemnity/breach of contract, (6) contribution, (7) declaratory relief, (8) contribution under CERCLA, and (9) contribution under the OPA.  The evidence at trial was directed to Plaintiffs' maritime tort claim.

4.     Plaintiffs' maritime tort claim is essentially a claim for negligence.  "The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law." *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840, 842 (5th Cir. 2005) (citations omitted).  Those elements are:

> 1) the existence of a duty of care owed by the defendant to the plaintiff; 2) the breach of that duty of care; 3) a causal connection between the offending conduct and the resulting injury, which is called "proximate cause"; and 4) actual loss, injury or damage suffered by the plaintiff.

*Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001) (citing 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-2, at 170 (3d ed. 2001)).

5.     The United States Supreme Court has established that the owner of a tug owes the owner of the tow "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City*, 285 U.S. 195, 202 (1932).

6.     In this case, Plaintiffs assert that standard of care encompassed several specific duties.  First, Plaintiffs assert Defendants had a duty to prepare the Albion for tow.  Second, Plaintiffs contend Defendants had a duty to provide an adequate lookout of the Albion during the towage.  Third, Plaintiffs argue Defendants had a duty to take action after the Albion started flooding.  Fourth, Plaintiffs claim Defendants had a duty to perform a "turnover" orientation when Defendant Hughes assumed command of the Tug.  Finally, Plaintiffs maintain Defendants had a duty to ensure the Tug was properly equipped for an emergency.

7.     As part of preparing the Albion for tow, Plaintiffs assert Defendants had a duty to "dog," or lock, the propeller drive shafts on the Albion.  The evidence supports the existence of this duty.  Dr.

Robert Stewart, Plaintiffs' expert on towing and seamanship, opined that a tug has a duty to "dog" the shafts in preparation for the tow. (Stewart Test. at 17-19.)[1] Mr. Ruttschow also confirmed that the crew of the Michael Uhl "had to dog the shafts" in preparation for the tow. (Ruttschow Test. at 12.) Likewise, Mr. Loving testified that his crew has "a habit of dogging the shafts." (Loving Test. at 4.) Therefore, Defendants had a duty to "dog" the shafts on the Albion in preparation for the tow.

8.      Having established the existence of this duty, Plaintiffs now bear the burden of proving Defendants' breach. To satisfy this burden, Plaintiffs rely on photographs of the starboard and port engines and attached shafts taken on March 11, 2008, by their causation expert, Randell Sharpe.[2] Those photographs reflect a metal bar affixed to the starboard shaft log, and the absence of a similar bar on the port shaft log. (*Compare* Pls.' Ex. 79 *with* Pls.' Ex. 80.)

9.      The testimony supports a finding that this bar was used to "dog" the shafts. Although Mr. Hughes assumed the role of tow master in Morro Bay, he admitted that he did not know how the shafts were "dogged." (Rep.'s Tr., Bench Trial/Day Two at 26.) Mr. Ruttschow (1) received "orders on how to dog the shafts," (Ruttschow Test. at 15), which orders he presumably would have passed on to "one of [his] two deckhands," (*id.* at 51); (2) asserted repeatedly that he inspected the shafts both in San Diego and in Morro Bay and found them to be secure; and (3) was responsible for unlocking the shafts in case the Albion needed to be motored "on its own bottom." (*Id.* at 15.) Yet, he was unable to recall how the shafts were "dogged." (*Id.*)

10.     The only person who remembered seeing anything on the shafts was Mr. Lambert. (*See* Pls.' Designation of the Dep. Testimony of Barry A. Lambert, Ex. A at 79-80.) Mr. Lambert stated there was "[s]ome kind of a piece of bar or something that was on it." (*Id.* at 80.) This testimony is consistent with Mr. Carpenter's trial testimony that he saw Mr. Leage "messing around with some pieces of steel" while the tug crew was preparing the Albion for tow. (Rep.'s Tr., Bench Trial/Day One at 126.) Mr. Lambert's testimony also finds support in Ms. Ragsdale's testimony that Mr. Leage

---

[1]  Dr. Stewart is a Navy veteran, and the senior member of the Marine Transportation Faculty at the California Maritime Academy. (*Id.* at 4, 6.)

[2]  Mr. Sharpe is a Lieutenant Commander of the United States Coast Guard (ret.), and is self-employed as a marine surveyor and accident reconstruction consultant. (Rep.'s Tr., Bench Trial/Day Two at 111.)

1    interrupted a conversation she was having with Mr. Carpenter and Mr. Loving by "[coming] up with

2    a sliver of metal and ask[ing] Frank what to do with this. And Frank said to go ahead and drill a hole

3    in it." (Ragsdale Test. at 9-10.) Ms. Ragsdale testified she later saw a picture depicting that same

4    piece of metal as "[t]he locking mechanism for the drive shafts." (*Id.* at 10.) Mr. Carpenter also stated

5    he saw a similar material on the transmission on the starboard side of the Albion remains. (Carpenter

6    Test. at 287.)[3] This testimony, combined with the photographs of the starboard and port engines and

7    drive shafts, supports a finding that Defendants failed to "dog" the port shaft.

8    11.    Other evidence also supports this finding. Mr. Sharpe testified that there was marine growth

9    inside the port shaft coupling, but not inside the starboard shaft coupling. (*See* Rep.'s Tr., Bench

10    Trial/Day Two at 125-27.) That evidence led Mr. Sharpe to conclude that the port shaft coupling "was

11    empty for the time that the vessel sat on the bottom of the ocean." (*Id.* at 126.) He opined that the

12    coupling was empty because the failure to "dog" the port shaft combined with "the force on the

13    propeller when the vessel is being towed and the fact that it was allowed to turn, freewheel, allowed

14    that coupling to come apart." (*Id.* at 128-29.)

15    12.    One of Defendants' experts, James Wood, disagreed with Mr. Sharpe's opinion that there was

16    marine growth inside the port shaft coupling. (*See* Rep.'s Tr., Trial Testimony of James Wood

17    ("Wood Test.") at 50-51.)[4] Mr. Wood opined that there was "some sort of epoxy" inside the coupling.

18    (*See id.*) However, unlike Mr. Sharpe, Mr. Wood did not personally examine the evidence. (*See id.*

19    at 27-28.) Furthermore, Mr. Sharpe explained that one would be unable "to install the shaft into a

20

---

21    [3] The Court notes Mr. Loving testified that he had a conversation with Mr. Carpenter in which

22    he recommended using a bar with two holes to "bolt" the shafts, and Mr. Carpenter was pleased with
     that recommendation. (Loving Test. at 4-6.) Although this is consistent with the testimony set out

23    above, the Court has some doubts about Mr. Loving's version of his conversation with Mr. Carpenter.
     Specifically, it belies common sense that Mr. Carpenter, a man with years of professional experience

24    with drive shafts, (*see* Rep.'s Tr., Bench Trial/Day Two at 47-48), "didn't seem to know anything"
     about locking the shafts on the Albion. (Loving Test. at 29.) The Court also notes that Mr. Loving

25    directly contradicted Plaintiffs' testimony that he never told them he was going to substitute out as
     captain in Morro Bay. (*Compare* Rep.'s Tr., Bench Trial/Day Two at 153, Ragsdale Test. at 11-12

26    *with* Loving Test. at 9.)

27    [4] Mr. Wood is a Navy veteran and self-employed as a marine surveyor. (*Id.* at 3.) He was
     initially hired by Plaintiffs' insurer to handle Plaintiffs' claim arising out of the sinking of the Albion.

28    (*Id.* at 6.) Mr. Wood investigated the claim, and thereafter opined that Albion struck a submerged
     object that caused it to go down. (*Id.* at 10.) Subsequently, Mr. Wood was retained as an expert in
     this case on the issues of causation and valuation of the Albion.

07cv0166

coupling that had that much debris in it, were it epoxy. It just wouldn't fit." (Rep.'s Tr., Trial Testimony of Randell Sharpe/Day Two ("Sharpe Test. Day Two") at 38.)

13.     Defendants' other attacks on Mr. Sharpe's opinions are equally unpersuasive. Defendants argue that the shaft zinc would have prevented the shaft from sliding more than two inches aft. (Defs.' Closing Argument at 2.) To support this argument, Defendants rely on the testimony of Mr. Wood. (*See id.*) However, Mr. Wood did not take any measurements of the diameter of the shaft zinc as compared to the opening of the strut. Furthermore, both Mr. Wood and Mr. Sharpe testified that the purpose of the shaft zinc is to prevent corrosion of other metals, including the shaft. (*See* Rep.'s Tr., Wood Test. at 35; Rep.'s Tr., Sharpe Test. Day Two at 33-34.) There was no evidence that the shaft zinc is intended to prevent the shaft from sliding out of the boat.

14.     Defendants also urge the Court to "disregard" Mr. Sharpe's testimony because the physical evidence underlying his opinion was "incomplete and damaged." (Defs.' Closing Argument at 2.) However, these concerns did not prevent Defendants' experts from relying on the same evidence. Furthermore, there is no evidence that the discrepancy between the metal bar on the starboard shaft and the lack of a metal bar on the port shaft was caused by either pillage or physical abuse. Common sense also works against Defendants. For example, why would someone remove a metal bar from the port shaft? And if they did, why would they replace the bolt, which would have to be removed prior to releasing the metal bar? It is also unclear how the metal bar could have broken loose from the shaft without also breaking off the bolt. Defendants' assertion that this evidence could have been damaged during the salvage attempt also lacks support.

15.     After considering the evidence and arguments discussed above, the Court finds Plaintiffs have met their burden of proving that Defendants breached their duty to "dog" the port shaft of the Albion.

16.     The next issue is whether Plaintiffs have established that Defendants' breach caused the Plaintiffs' damage. *See The White City*, 285 U.S. at 202. Three experts testified on this issue: Mr. Sharpe, Mr. Wood and Todd Schwede.[5] All three experts concluded that the Albion sank as a result

---

[5] Mr. Schwede is a marine surveyor and investigator. (Rep.'s Tr., Trial Testimony of Todd Schwede ("Schwede Test.") at 4.) He lives on a houseboat that was downwind of the Albion while it was docked at Nielsen Beaumont. (*Id.* at 9.) His office is also near the Albion's previous dock space at Nielsen Beaumont. (*Id.* at 10.)

07cv0166

of flooding.  Mr. Sharpe opined "that the most likely cause of the flooding of the Albion was due to the port propeller shaft backing out of the stuffing box and allowing water to flood the vessel through the shaft log area."  (Rep.'s Tr., Bench Trial/Day Two at 115.)  Mr. Wood opined that the flooding was the result of the Albion either striking "a submerged object while under tow," or "just strict age."  (Wood Test. at 77.)  Mr. Schwede shared Mr. Wood's concern that the Albion may have struck a submerged object, or that the flooding was caused by a sprung plank.  (Schwede Test. at 107.)

17.     Of these opinions, the Court finds Mr. Sharpe's to be the most credible, reasonable and reliable.  Mr. Sharpe was the only expert to examine the physical remains of the Albion and the testimony of the tug crew in forming his opinion.  Although Mr. Wood reviewed the testimony of the crew, he did not personally examine the remains of the Albion.  Mr. Schwede personally examined the remains, but he did not review the testimony of the crew.  Indeed, he testified that he didn't "necessarily need" the testimony of the crew to reach his conclusions.  (*Id.* at 100-01.)

18.     Mr. Sharpe was the only expert to perform flooding calculations for the Albion.  He assumed "a two-inch hole in the hull[,]" which would have resulted from the port shaft sliding out of the coupling.  (*Id.* at 15.)  Based on a hole of that size, Mr. Sharpe found that it would have taken more than four hours for the Albion to be "essentially flooded to its full height of the hull."  (*Id.*)  In contrast, if the Albion suffered a "catastrophic collision with some piece of unknown underwater debris" resulting in "a 10-square-foot hole, only four feet down in the bottom, you would find that the vessel is completely flooded in less than a minute.  It would have been a sudden, immediate sinking, basically, of the vessel."  (*Id.* at 39.)

19.     As Mr. Sharpe explained, the evidence in this case did not reveal a "sudden, immediate" sinking.  Rather, Mr. Hughes testified that he first noticed a problem with the Albion at 8:00 p.m.  (Rep.'s Tr., Bench Trial/Day Two at 49.)  At that time, the Albion was yawing and was down by the bow.  (*Id.* at 52.)  Fifteen to twenty minutes later, after the crew had shortened the tow line, the decks of the Albion were awash.  (*Id.* at 51.)  The following morning, "[t]he bulwarks around the wheelhouse, and the bulwarks or small little railing that was up in the bow, the wheelhouse, super structure, the mast" were all still above water.  (*Id.* at 62-63.)  The nature of this sinking, therefore, supports Mr. Sharpe's opinion and refutes the theory that the Albion struck a submerged object.

20.     Other evidence also refutes the theory that the Albion flooded due to old age or a sprung plank. The day before the tow began, Mr. Carpenter and Mr. Ruttschow motored the Albion "on its own bottom" from its slip to the fuel dock, and then out into San Diego Bay where they did "donuts" and "play[ed] around" for about two hours. (Rep.'s Tr., Bench Trial/Day One at 137.)  Mr. Loving testified that he thought the Albion was sound. (Loving Test. at 25.)  Mr. Hughes testified that the Albion "seemed seaworthy" to him. (Rep.'s Tr., Bench Trial/Day Two at 18-19.)  Mr. Ruttschow inspected the Albion before starting the tow, and he thought it was sound. (Ruttschow Test. at 40.) Mr. Dupre believed the boat was "a good, stout, solid vessel," (Dupre Test. at 21), and Mr. Carpenter said the boat was "fine. Everything was stable." (Rep.'s Tr., Bench Trial/Day One at 142.) Also, Mr. Ruttschow inspected the bilges of the Albion while the vessels were moored in Morro Bay, and found nothing unusual about the amount of water in them. (Ruttschow Test. at 57.)  All of this testimony rebuts the theories that the Albion flooded due to old age or a sprung plank.

21.     The most credible, reasonable and reliable theory of causation is that put forth by Mr. Sharpe: "the most likely cause of the flooding of the Albion was due to the port propeller shaft backing out of the stuffing box and allowing water to flood the vessel through the shaft log area.   That overwhelmed any installed pumps, and the vessel foundered because of that." (Rep.'s Tr., Bench Trial/Day Two at 115.)  Furthermore, according to Mr. Sharpe, the shaft backed out of the stuffing because "the shafts were not properly locked for the tow[, which] exacerbated the situation, and the freewheeling of that propeller, along with the forces of water flowing past it, over time, basically, worked that shaft coupling apart and allowed the shaft to back out of the stuffing tube." (*Id.* at 116.) Based on this evidence, Plaintiffs have met their burden of proving causation.

22.     The only remaining element of Plaintiffs' negligence claim is damages.  In cases such as this where the vessel is a total loss, "the measure of damages is its market value, if it has a market value, at the time of destruction." *Standard Oil Co. of New Jersey v. Southern Pacific Co.*, 268 U.S. 146, 155 (1925).  Market value is "established by contemporaneous sales of like property in the way of ordinary business[.]" *Id.*

23.     Both Mr. Sharpe and Mr. Wood offered opinions on the market value of the Albion at the time of her sinking.  Mr. Sharpe opined that the market value of the Albion was $170,000, (Rep.'s Tr.,

Bench Trial/Day Two at 169), while Mr. Wood opined her value was somewhere between $40,000 and $60,000.

24.     In arriving at his valuation, Mr. Sharpe reviewed "various published guides that are available for the values of vessels," (*Id.* at 167), including "the Buc book value guide" and "the Nada value guides[.]" (*Id.* at 169.) Mr. Sharpe also "reviewed the sold boats information on the internet." (*Id.* at 167.) In searching soldboats.com, Mr. Sharpe used the following parameters: (1) power-driven vessel, (2) sold between January 1, 2002, and January 31, 2008, (3) size between 53 and 62 feet, and (4) wooden vessels built between 1960 and 1971. (*Id.* at 168.) He "then took into consideration the testimony about the restoration of [the Albion] and where it was in that process." (*Id.* at 167.) He abbreviated his methodology as "a combination of published values, comparable sales prices, and then condition of the vessel." (*Id.*)

25.     Like Mr. Sharpe, Mr. Wood consulted the Buc book and soldboats.com to arrive at his valuation. (Wood Test. at 14.) Mr. Wood consulted the 2004 edition of the Buc book, and did not find any valuations for 1965 vessels so he used the valuation of two 1971 wooden vessels. (*Id.* at 20.) The first vessel was slightly smaller than the Albion, and was valued between $99,800 and $109,500. (*Id.*) Mr. Wood then adjusted the price upward for location to between $109,600 and $120,450. (*Id.* at 21.) He then deducted from that value based on the Albion being in "poor" condition to arrive at a value between $54,800 and $60,225. (*Id.*)[6] Assuming the Albion was in "restorable" condition,[7] the value would have been between $21,920 and $24,090. (*Id.*) The second vessel was slightly larger than the Albion, and was valued between $124,850 and $137,500. (*Id.*) "Poor" condition resulted in a value of $62,425 and $68,750, and "restorable" condition resulted in a value between $24,970 and $27,400. (*Id.*) In consulting soldboats.com, Mr. Wood again used 1971 vessels. (*Id.* at 22.) The sales price of those vessels ranged from $100,000 to $200,000. (*Id.*) However, Mr. Wood found those figures did not represent comparable sales because they were "fully found" vessels and the Albion was not. (*Id.*)

---

[6]  The Buc book describes a vessel as in "poor" condition if "substantial yard work" is required, and the vessel is "devoid of extras." (Defs.' Ex. OO.)

[7]  The Buc book describes "restorable" condition as "[e]nough of hull and engine exists to restore the boat the useable condition." (Defs.' Ex. OO.)

26.     The Court agrees with Mr. Wood that the figures from soldboats.com do not represent comparable sales in this case.  As stated in *Standard Oil*, comparable sales must be "of like property[,]" 268 U.S. at 155, and the Albion was not like any of the vessels on soldboats.com. Therefore, other evidence was necessary to establish "the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." *Id.* at 155-56.

27.     The only evidence of this sum comes from the Buc book.  Although Mr. Wood testified to the values in the Buc book, the Court notes that the figures listed therein differ from the figures mentioned at trial.  (*Compare* Wood Test. at 20-22 *with* Defs.' Ex. OO.)  The Buc book lists a total of three vessels similar to the Albion in age, make and model.  (*See* Defs.' Ex. OO.)  One of those vessels is smaller than the Albion and the others are larger than the Albion.  (*Id.*)  The retail low of the smaller vessels is $99,100, and the retail high of the larger vessels is $130,000.  (*Id.*)  This amounts to an average value of $114,550.  As Mr. Wood indicated, the values in the Buc book should be adjusted for location, in this case adjusted upward by ten percent.  (Wood Test. at 20-21; Defs.' Ex. OO.)  This results in a total base value of $126,005.  Neither Mr. Wood nor Mr. Sharpe opined that the Albion was in "restorable" condition.  Based on his ultimate valuation, it appears Mr. Wood found the Albion was somewhere between "poor" and "restorable" condition, and Mr. Sharpe opined the Albion was "somewhere between poor and fair condition[.]"  (Sharpe Test. Day Two at 22.)  Based on the evidence presented at trial, the Court finds the Albion was in "poor" condition, and the base value should be reduced by 35 percent.  This results in a total value of $88,203.50.

28.     This is not the only element of damages in this case, however.  Plaintiffs also seek recovery of $215,630.90 in costs incurred in attempting to raise the Albion, and damages paid to settle the United States' environmental claims against Plaintiffs and Defendants arising out of the sinking of the

/ / /

/ / /

/ / /

/ / /

07cv0166

Albion.[8]  These additional elements of damage are attributable to Defendants' negligence, and thus Plaintiffs are entitled to their recovery.  Accordingly, the total amount of Plaintiffs' recovery due to Defendants' negligence is $591,539.15.

29.     Whether Plaintiffs are entitled to recover this amount, however, depends on whether Defendants are entitled to recover on their counterclaims.  The counterclaims sound in contributory negligence, and raise the issue of whether Plaintiffs breached their duty to tender a seaworthy tow.

30.     The law is clear that the tow "warrants the seaworthiness of the vessel-that it is sufficiently staunch to withstand the pressures that ordinarily accompany the intended voyage." *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1183-84 (5th Cir. 1984) (citations omitted).  In this case, Defendants assert there is a presumption that the Albion was not seaworthy because it sank in fair weather and calm seas.  However, that presumption applies only if the tow was properly handled.  *See id.* at 1184 (quoting *Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F.2d 1077, 1081 (5th Cir. 1983)) ("Where 'a barge in tow sinks in calm water for no immediately ascertainable cause ... *in the absence of proof that the barge was improperly handled*, the vessel's sinking is presumed to be a direct result of her unseaworthiness[.]'") (emphasis added).  Here, Plaintiffs have shown that Defendants were negligent in their handling of the Albion, therefore the presumption of unseaworthiness does not apply.

31.     Nevertheless, Defendants persist in their argument that the Albion was unseaworthy.  In light of their negligence in handling the Albion, Defendants bear the burden of proving the Albion was unseaworthy.  *See Shebby Dredging Co., Inc. v. Smith Bros., Inc.*, 469 F.Supp. 1279, 1284 (D. Md. 1979) ("Although the owner of the tow is responsible for its seaworthiness, the burden of proof to establish that a vessel is unseaworthy rests upon the party making such assertion.")

32.     To meet this burden, Defendants rely on the testimony of Mr. Stocks and Mr. Schwede.  Mr. Stocks took the underwater video of the Albion on February 9, 2005.  While taking the video, Mr. Stocks noticed what "looked like dry rot" on the starboard side of the hull, as well as "some chipping

---

[8] Plaintiffs assert the amount of damages paid in settlement to the government is $289,794.75. (Pls.' Closing Brief at 9 n.2.)  However, the amount stipulated during trial was $287,704.75.  (*See* Rep.'s Tr. at 71, May 5, 2009.)  Accordingly, the Court will use this amount in calculating Plaintiffs' damages.

of the paint." (Stocks Test. at 16.) He thought the exterior of the hull looked "very, very rough." (*Id.* at 17.) When he opened a hatch, the screws fell out. (*Id.* at 23.) He also noticed what looked like "soft wood" along the hull. (*Id.* at 24.) Mr. Stocks's assessment of the condition of the Albion, however, is entitled to little weight. First, Mr. Stocks was 185 feet under water when he assessed the condition of the vessel. Second, he was not there to determine whether the Albion was seaworthy, if in fact that could be done underwater, but rather he was taking the video to document work he had performed for the salvage operation to ensure he would be paid. (*Id.* at 8.) Third, by the time Mr. Stocks took the video the vessel had been underwater for ten days and subjected to a failed lift attempt that ripped off the upper structure of the vessel. (*See* Ruttschow Test. at 35.) Although there was no evidence of the precise effect that would have had on the condition of the vessel, the video indicates it suffered substantial damage as a result of the failed lift attempt. Therefore, Mr. Stocks's testimony does not establish the Albion was unseaworthy when she was turned over to Defendants.

33.     Mr. Schwede's testimony on this issue is similarly unhelpful. First, Mr. Schwede did not examine the Albion prior to the tow. Rather, he examined the remains of the vessel, which had been on the ocean floor for more than eighteen months, (*see* Rep.'s Tr., Bench Trial/Day One at 54-55), and in storage for an additional two years. Second, his testimony about leaks in the vessel is contradicted by the testimony of the tug crew, none of whom noticed an unusual amount of water in the bilges either prior to the tow or while the vessel was docked in Morro Bay. Mr. Schwede's opinion is also undermined by the testimony of the tug crew, none of whom thought the Albion was unseaworthy prior to undertaking the tow. The successful sea trials of the Albion on the day before the tow also detract from Mr. Schwede's opinion. Accordingly, neither his testimony nor the testimony of Mr. Stocks establishes that the Albion was unseaworthy at the time she was turned over to Defendants.

34.     Absent a finding that the Albion was not seaworthy, Defendants are not entitled to any recovery from Plaintiffs.[9]

/ / /

---

[9] These conclusions resolve the parties' remaining claims, therefore the Court will not address the balance of the claims.

/ / /

### III.

### CONCLUSION AND ORDER

Based on the foregoing findings of fact and conclusions of law, the Court orders as follows:

1. Plaintiffs shall recover $591,539.13 in damages from the Defendants.

2. Defendants shall recover nothing on their Counterclaim.

3. If Plaintiffs wish to pursue attorneys' fees and costs, they must file a motion pursuant to Federal Rule of Civil Procedure 54(d).

4. The Clerk of Court shall enter judgment consistent with this Order.

**IT IS SO ORDERED**.

DATED: June 18, 2009

_____
HON. DANA M. SABRAW
United States District Judge

07cv0166